626 F.2d 1060
 6 Fed. R. Evid. Serv. 401
 FACT CONCERTS, INC. and Marvin Lerman, Plaintiffs-Appellees,
v.
The CITY OF NEWPORT, The State of Rhode Island, Mayor
Humphrey J. Donnelly III, Individually and in his Official
Capacity as Mayor, the City Council for the City of Newport
and Lawrence Newsome, John H. West, Robert O. Beatti,
Raymond H. Carr, Edward K. Coristine, James F. Ring, all
Individually and in their Official Capacity as Members of
the City Council for the City of Newport, Rhode Island,
Defendants-Appellants.
 No. 79-1397.
 United States Court of Appeals,
First Circuit.
 Argued Feb. 1, 1980.
Decided June 17, 1980.
 
 Guy J. Wells, Providence, R. I., with whom Gunning, Lafazia & Gnys, Inc., Providence, R. I., was on brief, for defendants-appellants.
 Leonard Decof, Providence, R. I., with whom Jay S. Goodman and Decof, Weinstein & Mandell, Providence, R. I., were on brief, for plaintiffs-appellees.
 Before COFFIN, Chief Judge, CAMPBELL and BOWNES, Circuit Judges.
 BOWNES, Circuit Judge.
 
 
 1
 In August of 1975, the City Council of Newport, Rhode Island, voted to revoke a license to conduct two jazz concerts previously issued to Fact Concerts, Inc., unless the musical group Blood, Sweat and Tears was removed from the program. The City of Newport (the City) and five Newport city councillors now appeal from a jury verdict awarding compensatory and punitive damages to Fact Concerts for violation of its first amendment right to promote and produce the concerts and for interference with Fact Concerts' contractual relationships with its performers, ticket holders and concessionaires.
 
 
 2
 Appellants allege the district court erred in (1) denying the defendants' motion to dismiss, motion for a directed verdict, motion for judgment n. o. v. and motion for a new trial, (2) instructing the jury that punitive damages might be found against the City, and (3) allowing a defendant city councillor to be cross-examined concerning his knowledge of an earlier, unsuccessful attempt by the City to refuse to issue a permit for an antiwar exhibition and out-of-court remarks made by the councillor indicating contempt for the judicial process. After reviewing these allegations in a light clouded by the defendants' failure to object at trial to several of the matters now raised on appeal, we affirm.
 
 The Facts
 
 3
 Evidence was introduced at trial tending to show the following facts.
 
 
 4
 In the summer of 1975, Fact Concerts obtained a license from the Rhode Island Department of Natural Resources to hold a series of three concerts in Fort Adams, a large, state-owned facility located in Newport, Rhode Island. The City issued a permit for the first concert, which featured Arthur Fiedler, and the concert took place uneventfully. The two remaining concerts, originally scheduled for early August, were rescheduled for August 30th and 31st and licensed under a contract entered into with the City on August 23, 1975.
 
 
 5
 Fact Concerts prepared for the concerts throughout the summer in 1975, retaining eight well-known acts, including Sarah Vaughn, Dave Brubeck, Herbie Mann, Miles Davis and Stan Getz, to perform during the two days. Late in the summer, Sarah Vaughn cancelled her appearance because of a conflicting engagement and the group Blood, Sweat and Tears was retained to replace her. When the members of the Newport City Council learned of the addition of Blood, Sweat and Tears to the program, they became concerned that the group, which they considered a rock group rather than a jazz band, would attract an unruly audience to Newport, and initiated the efforts to force the removal of Blood, Sweat and Tears from the program which are the gravamen of this case.
 
 
 6
 On Monday, August 20th, Newport Mayor Donnelly informed Fact Concerts that he considered Blood, Sweat and Tears to be a rock group and that, because of riots the City experienced at previous rock concerts, he did not want rock groups appearing in Newport. Fact Concerts requested permission to appear at a Special City Council meeting the next day.
 
 
 7
 At the special Council meeting, Fact Concerts informed the Council that, contrary to its belief, Blood, Sweat and Tears was not a rock group. Fact Concerts offered as proof of this the group's appearances at Carnegie Hall and similar facilities around the world. Mayor Donnelly, also a member of the Council, reiterated his concern as to the audience Blood, Sweat and Tears would attract. Without attempting to verify Fact Concerts' representations concerning the nature of Blood, Sweat and Tears' music, the Council voted to cancel the license for both days unless the group were removed from the Sunday program. The Council's vote received extensive publicity, a fact subsequently shown to have dampened ticket sales.
 
 
 8
 Fact Concerts acceded to the Council's wishes by cancelling Blood, Sweat and Tears and hiring a replacement group, Weather Report. On Thursday, August 28th, Newport City Solicitor O'Brien informed Fact Concerts that the Council had changed its position and would allow Blood, Sweat and Tears to appear if they did not play rock and roll music.[1] Fact Concerts then rehired Blood, Sweat and Tears and agreed to attend another specially convened Council meeting the next day.
 
 
 9
 Mayor Donnelly opened the Friday meeting by noting the possibility of a lawsuit against the City if Blood, Sweat and Tears were not allowed to perform. He further stated that the City could either cancel the entire concert or allow Blood, Sweat and Tears to play subject to the limitation concerning rock and roll music. Although the latter option was advocated by City Solicitor O'Brien, Fact Concerts was never given the opportunity to assent to such an agreement. The cancellation option received more favorable consideration after City Manager Perry reported that Fact Concerts had failed to fulfill two provisions of its contract: installation of an auxiliary electric generator and wiring together the individual spectator seats by 3:00 p. m. Friday.[2] Finding that Fact Concerts had failed to perform its obligation under the contract, the Council voted to cancel the contract. It then offered Fact Concerts a new contract for the same dates, specifically excluding Blood, Sweat and Tears. Fact Concerts informed the City that suit would be instituted if the original contract were not honored. Mayor Donnely responded by stating that the contract was cancelled because it had been breached by Fact Concerts. News of cancellation of the contract was broadcast extensively over local media that night, the eve of the concerts.
 
 
 10
 On Saturday morning, Fact Concerts obtained an injunction in state court restraining the city from interfering with the concerts. The show went on: 6,308 of a possible 14,000 tickets were sold for the two days of music, resulting in a loss of $72,910 to Fact Concerts.
 
 The Proceedings Below
 
 11
 Fact Concerts' complaint, as amended, included five counts. Count I sought a declaratory judgment of unconstitutionality of the ordinance under which Newport licensed concerts, and injunctive relief against the enforcement of it. Count II sought compensatory and punitive damages for violation, under color of state law, of Fact Concerts' first amendment right to promote and produce a concert. Counts III, IV and V, each pendent state claims, sought compensatory and punitive damages for breach of contract, interference with contractual relationships and tortious interference with advantageous relationships, respectively. The district court found the licensing ordinance constitutional and sent Counts II and IV to the jury redesignated as Counts I and II. The jury returned verdicts on both counts for Fact Concerts, awarding compensatory damages against all defendants in the amount of $72,910 and punitive damages as follows: the City, $200,000; Mayor Donnelly and Councillor West, $20,000 each; Councillors Carr, Coristine, and Newsome, $10,000 each; Councillors Beatti and Ring, $5,000 each. Faced with a new trial on the issue of damages, Fact Concerts accepted a remittitur of $125,000 in the punitive damages award against the City.
 
 The Motion to Dismiss
 
 12
 Defendants' motion to dismiss for failure to state a claim on which relief could be based, Fed.R.Civ.P. 12(b), lacked merit. As amended, Fact Concerts' complaint alleged that the defendants, acting under color of state law, intentionally interfered with Fact Concerts' first amendment right to promote and produce a concert, in violation of 42 U.S.C. § 1983.[3] Fact Concerts sought compensatory and punitive damages under both the § 1983 claim and the three pendent state law claims.
 
 
 13
 Defendants do not dispute that the first amendment, as applied to the states, Douglas v. City of Jeannette, 319 U.S. 157, 63 S.Ct. 877, 87 L.Ed. 1324 (1943), protects Fact Concerts' right to produce jazz concerts. Southeastern Promotions, Ltd. v. Conrad, 420 U.S. 546, 95 S.Ct. 1239, 43 L.Ed.2d 448 (1975). See also Stepping Stone Enterprises, Ltd. v. Andrews, 531 F.2d 1 (1st Cir.), cert. denied, 429 U.S. 823, 97 S.Ct. 74, 50 L.Ed.2d 85 (1976). And plaintiffs have not disputed that a municipality may deny a permit for legitimate public safety reasons, see Stepping Stone Enterprises, 531 F.2d at 3; We've Carried the Rich for 200 Years Coalition v. City of Philadelphia, 414 F.Supp. 611, 615 (E.D.Pa.1976), aff'd without published opinion, 538 F.2d 322 (3d Cir. 1976). However, defendants deny that Fact Concerts enjoyed a constitutional right to earn a profit from the concerts. This somewhat ingenuous argument ignores the fact that section 1983 provides that violators "shall be liable . . . for redress" and that the Supreme Court has construed section 1983 to comprehend, at the least, the payment of compensatory damages. Carey v. Piphus, 435 U.S. 247, 254-57, 98 S.Ct. 1042, 1047-49, 55 L.Ed.2d 252 (1978). Fact Concerts never claimed a property right in profits; it contended that the financial failure of the concerts was the result of the defendants' actions, and they were liable under section 1983 for the natural consequences of their acts. We note also that, since the jury's verdict does not indicate under which counts, the 1983 count or the pendent ones, the compensatory damages were awarded, this issue may be moot.
 
 
 14
 The Motions for a Directed Verdict and Judgment N. O. V.
 
 
 15
 In reviewing the denial of a motion for a directed verdict, we must examine the evidence in the light most favorable to the plaintiff and determine whether there are facts and inferences reasonably drawn from those facts which lead to but one conclusion that there is a total failure of evidence to prove the plaintiff's case. Fed.R.Civ.P. 50(a); Dehydrating Process Co. v. A. O. Smith Corp., 292 F.2d 653, 656 (1st Cir. 1961), cert. denied, 368 U.S. 931, 82 S.Ct. 368, 7 L.Ed.2d 194 (1962). The standard of review for denial of a motion for judgment n. o. v. is the same. Fed.R.Civ.P. 50(b); 5A Moore's Federal Practice § 50.07(2) (1980). Fact Concerts presented evidence from which the jury could have found the following facts: that, because of the advice of the City Solicitor and the City's earlier unsuccessful attempts to refuse to issue a permit for an antiwar exhibition, the defendants were aware that the concerts could not be cancelled because of their content; that, upon learning of the addition of the group Blood, Sweat and Tears to the Sunday concert program, the defendants attempted to induce the removal of the group from the program first by persuasion and then by coercion; and that, upon learning of the possibility of a lawsuit being filed against the City for harm to the reputation of Blood, Sweat and Tears, the defendants cancelled the concert for pretextual reasons. We see no failure of evidence to prove Fact Concerts' case.
 
 The Motion for a New Trial
 
 16
 The defendants requested a new trial on the grounds that punitive damages could not be awarded against a municipality under section 1983 and that, in any event, the size of the award of punitive damages against the City was excessive and the result of passion or prejudice. We discuss defendants' first ground later in this opinion. The district court correctly found some merit in defendants' second ground and ordered a new trial on the issue of damages, if Fact Concerts did not accept a remittitur in the amount of $125,000 in the punitive damages award against the City. Fact Concerts accepted, thereby nearly equalizing the punitive damages awarded against the City and the individual defendants as a group. We see no reason for additional relief.
 
 The Cross-Examination of Councillor West
 
 17
 As part of their case, defendants placed Councillor John West on the stand to testify concerning his extensive knowledge of the concert industry in general and the promotion of concerts in Newport in particular. The purpose of Councillor West's testimony was to show that defendants acted in good faith out of a reasonable concern for public safety. See Wood v. Strickland, 420 U.S. 308, 322, 95 S.Ct. 992, 1000, 43 L.Ed.2d 214 (1975). Defendants contend on appeal that the district court erred in allowing Councillor West to be cross-examined concerning his knowledge of an earlier, unsuccessful attempt by the City to refuse to issue a permit for an antiwar exhibition and out-of-court statements made by Councillor West indicating contempt for the judicial process. Although these matters have been framed by defendants to pose two different questions of law, we think they may be resolved in one analysis of their probative and prejudicial qualities.
 
 
 18
 The context of the cross-examination of Councillor West, ignored by defendants in their brief, is vital to this appeal. The district court indicated during Councillor West's direct testimony that it was having difficulty deciding plaintiff's many objections to that testimony because the direction or purpose of the testimony was unclear. After the jury had been dismissed for the day, but in the presence of Councillor West, counsel for defendants said the testimony was intended to show that "when the Council acted, whether they acted in error, whether they acted imprudently, they did not act with malice, they did not act with intent to deprive anyone of their First Amendment rights, that they were merely exercising perhaps super caution for the safety of the public . . . ."
 
 
 19
 The next morning, prior to the resumption of Councillor West's direct testimony, counsel for Fact Concerts requested a bench conference at which he informed the court that, if defendants offered a good faith defense through Councillor West, he would cross-examine Councillor West's on matters indicative of bad faith. Specifically, counsel for Fact Concerts said he would raise the earlier, unsuccessful effort of the Council to refuse to issue a permit for the exhibition in a city park of a "tiger cage," which opponents of the Vietnam War contended was used to incarcerate Vietnamese citizens. Counsel for Fact Concerts also said he would raise, on cross-examination of Councillor West, remarks made by him indicating contempt for the instant judicial proceeding. The court indicated such cross-examination would be permissible if a good faith defense were offered.[4] Thus, counsel for Fact Concerts made clear that the defendants' good faith defense would be rebutted in the only way available by showing that the defendants were aware that Fact Concerts enjoyed a constitutional right to produce a concert featuring Blood, Sweat and Tears and that the defendants intentionally interfered with that right. Moreover, counsel for Fact Concerts made clear that out-of-court statements made by Councillor West showing contempt for the legal process by which constitutional rights are protected would be raised on cross-examination.
 
 
 20
 The cross-examination went according to the prediction of counsel for Fact Concerts.[5] It was brought out that Councillor West was a member of a prior City Council which had been enjoined on first amendment grounds from interfering with public exhibition of the "tiger cage." He also admitted on cross-examination to making statements that could be interpreted as being contemptuous of the court's handling of the case.
 
 
 21
 We find that the admission of the testimony concerning the "tiger cage" case was probative of the Council's knowledge of the law in the area of the first amendment and, thus, bore directly on the issue of good faith.
 
 
 22
 The cross-examination concerning Councillor West's out-of-court statements, to which defense counsel objected only sporadically, was also within the limits of proper cross-examination. West, a defendant in the case, was a hostile, ascerbic witness. He testified as an expert in the production of concerts, as well as a member of the City Council. His credibility was fair game, Fed.R.Evid. 611(b), and his attitude toward the proceedings, as reflected in voluntary statements made by him to other parties, was probative of whether his testimony would be of the objective nature expected of an expert. In these circumstances, Fact Concerts had a right to expose to the jury the remarks Councillor West made out-of-court concerning the judicial process. See United States v. Kartman, 417 F.2d 893, 897 (9th Cir. 1969). See also United States v. Houghton, 554 F.2d 1219, 1225-26 (1st Cir.), cert. denied, 434 U.S. 851, 98 S.Ct. 164, 54 L.Ed.2d 120 (1977).
 
 The Punitive Damages Instruction
 
 23
 Defendants challenge as error the district court's instruction allowing the jury to award punitive damages against the City of Newport. Like other of defendants' allegations of error, this one is flawed by the failure to object to the charge at trial. See Fed.R.Civ.P. 51.[6] We may overlook a failure of this nature, Williams v. City of New York, 508 F.2d 356, 362 (2d Cir. 1974), but only where the error is plain and "has seriously affected the fairness, integrity or public reputation of a judicial proceeding." Morris v. Travisono, 528 F.2d 856, 859 (1st Cir. 1976) quoting 9 C. Wright & A. Miller, Federal Practice and Procedure, § 2558 at 675 (1971).
 
 
 24
 Here, it is by no means certain that the court's instructions constituted error. This is an area of the law in which there has been and apparently still is, considerable movement. We have held on two occasions that punitive damages are available against section 1983 defendants when there are aggravating circumstances. Alicea Rosado v. Garcia Santiago, 562 F.2d 114, 121 (1st Cir. 1977) (bad faith); Caperci v. Huntoon, 397 F.2d 799, 801 (1st Cir.), cert. denied, 393 U.S. 940, 89 S.Ct. 299, 21 L.Ed.2d 276 (1968) (unwarranted invasion of privacy). Although the Supreme Court has never fully addressed the question, it has edged toward a similar conclusion. Carlson v. Green, --- U.S. ----, ----, 100 S.Ct. 1468, 1471, 64 L.Ed.2d 15 (1980) (dictum); Carey v. Piphus, 435 U.S. 247, 254-55 n. 11, 98 S.Ct. 1042, 1047-48, 55 L.Ed.2d 252 (1978). When our rule on this point is viewed in light of the Supreme Court's determination that municipalities are "persons" within the ambit of section 1983, Monell v. New York City Dep't of Social Services, 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978), there arises a distinct possibility that municipalities, like all other persons subject to suit under section 1983, may be liable for punitive damages in the proper circumstances. There certainly is no imposing body of law to the contrary.
 
 
 25
 In short, the present state of the law as to municipal liability is such that we cannot with confidence predict its future course. Where the law is in such a state of flux and there is no appellate decision to the contrary, we would be hard-pressed to say that the trial judge's punitive damages instruction was plain error. See United States v. Petrozziello, 548 F.2d 20, 23 (1st Cir. 1977). Nor is this a case containing such "peculiar circumstances (to warrant noticing error) to prevent a clear miscarriage of justice." Nimrod v. Sylvester, 369 F.2d 870, 873 (1st Cir. 1966).
 
 
 26
 Affirmed.
 
 
 
 [1]
 Testimony at trial tended to show that the City made this decision because Blood, Sweat and Tears had stated publicly its intention to sue the City for injury to its reputation
 
 
 [2]
 Testimony at trial tended to show that the auxiliary generator was in place but had been overlooked by the City Manager. There also was testimony that the chairs were fastened together by tape and that this was completed shortly after the 3:00 p. m. deadline. Testimony was offered to the effect that the special tape used on the chairs was stronger and more effective than wire and that, in any event, the chairs were in solid blocks of twelve and could not be used as weapons. The Rhode Island Department of Natural Resources testified that the preparation of Fort Adams by Fact Concerts was satisfactory for health and safety purposes
 
 
 [3]
 42 U.S.C. § 1983 provides:
 Every person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress.
 
 
 [4]
 Transcript of Bench Conference
 MR. DECOF: I would like to place on the record that if Mr. Faerber goes forward now with this so-called good-faith evidence I intend to examine and educe (sic )from this witness the fact that he was aware that the right of free speech was involved, he had previously been enjoined by this very Court as had the City Council of Newport in a prior case involving a tiger case in Eisenhower Park in Newport, that he has not only disregard but contempt for that ruling of the Court, as well as the present proceeding.
 THE COURT: That's permissible cross-examination.
 MR. DECOF: And that he has, let me finish, please, that he has expressed his contempt for the present proceedings in my hearing while I was at counsel table and stated to the other members of the counsel, and I quote, "This is a travesty in this court, I don't have to go to church for ten weeks, because I've been in this courtroom for a week." Another quote, "The Judge is the closest thing to God on earth." And I just want to put this on the record before I ask these questions to go into the, if we go into the state of mind of this individual with reference to good faith.
 THE COURT: It's permissible in cross-examination.
 MR. DECOF: Thank you, your Honor.
 MR. FAERBER: Well, your Honor, I would simply observe that on the issue of the, I assume Mr. Decof is referring to the tiger cage issue, there was a restraining order issued in that case, he was, I believe, a member of the counsel at that time, but the case was never tried after the restraining order was issued. The tiger cage was permitted in Eisenhower Square, and the case was dismissed by stipulation.
 THE COURT: I know, but you see, Mr. Faerber, you're talking now of good faith, and cross-examination can be directed to showing that there really isn't good faith.
 MR. FAERBER: Yes, your Honor. Is this limited to this one individual?
 THE COURT: I don't know, I can't rule now, I must rule as it develops.
 (Conclusion of side bar colloquy)
 
 
 [5]
 Transcript of Cross-Examination
 Q You sat here in the courtroom yesterday while the jury was out, while his Honor stated to Mr. Faerber and in your presence that the only
 MR. FAERBER: I object to anything being stated while the jury was out, being recited before the jury.
 THE COURT: Sustained.
 Q You heard the discussion here to the effect that a defense that the City of Newport could raise, the only defense would be "public safety"? Didn't you, sir?
 A I believe I did, yes.
 Q Well, you know, don't you, sir,
 A There's also good faith.
 Q You said "good faith," right?
 A Right.
 Q You heard these things?
 A Yes, I did, but I think you have to say all statements, all things, not just the ones you want to state.
 Q Mr. West, I will give you the opportunity to say every single thing you want to.
 A I doubt it, sir, with you questioning me.
 Q You don't like the way I question you, or you don't like what's going on in this courtroom?
 A You only asked the question to which you want the answer.
 Q Sir, let me ask you, with reference to the matter of free speech, you were a member of the City Council when the City Council was restrained by his Honor, Chief Judge Pettine, from limiting the right of free speech of certain people in Newport, isn't that correct, sir?
 MR. FAERBER: I object.
 THE COURT: Overruled.
 A You must be more specific than that.
 Q You don't know what I'm talking about?
 A No, I don't.
 Q Do you recall the event, sir, when some people wanted to demonstrate in the City of Newport over the way prisoners were being handled in the Vietnam War and they wanted to put a tiger cage on the premises at Eisenhower Park, do you remember that, sir?
 A Yes, I do.
 Q And you were on the City Council of the City of Newport, isn't that right?
 A Yes, sir, I was.
 Q And the city refused to allow that to happen?
 A We refused to grant them a license, sir.
 Q And they went to the Federal Court, to this very Federal Court, is that right?
 A Yes, they did.
 Q And before this very Chief Judge, Judge Pettine, isn't that right, sir?
 A Yes.
 Q And he issued a restraining order, an injunction restraining the City of Newport and you, as a member of the City Council, from interfering with the right of these people to exercise free speech in the form of demonstration, isn't that right, sir?
 A Slightly incorrect, he refused the rights of us not to grant them a license, which is a little bit different as far as I was concerned. They had applied for a license, we refused it, and Judge Pettine refused to allow us to refuse the license.
 Q More precisely what happened is, in other words, he enjoined you people from refusing a license?
 A Well, that's his opinion, sir, you can't hold me accountable for the Judge's opinions.
 Q As a matter of fact, you don't have much respect for the Judge's opinion, do you, sir?
 A About as much as you have.
 Q I take great issue with you, sir did you not say in open court, not in open court, but in my presence last Friday to other members of the council, "This case is a travesty"?
 MR. FAERBER: I object, your Honor.
 THE COURT: Overruled.
 A I don't recollect, sir.
 Q You don't recollect that?
 A No.
 Q Please be careful, Mr. West, because there are a number of people who overheard this statement. I'd like you to search your memory, did you say last Friday, I'm sorry, just yesterday, sitting at that table, to the other members of the City Council, "This case is a travesty"?
 A I may have.
 Q Did you also say, sir, to the other members of the City Council in my hearing, "I don't have to go to church for ten weeks, because I've been in this courtroom for a week," did you say that sir?
 A I may have.
 Q Well, you know you did, don't you, sir?
 A I may have said those things, yes.
 Q Well, did you or didn't you?
 A I may have.
 Q You seem to have some difficulty recalling it, didn't you say those things yesterday, sir?
 Q In the context that you present this, sir, its misdirected, my disrespect for the Judge, and if you took it that way, that's your opinion, it could have been misdirected for you, and what you're attempting to do, because
 Q But didn't you make those remarks, sir?
 A Yes.
 Q All right. We've got that established. We also established that it wasn't the Judge, perhaps, that you were mad at, but did you also say, sir, that the closest thing to God on earth is a Judge, did you say that, sir?
 A I think that's a matter of public fact, everyone knows that, you included.
 Q And didn't you say this in a derogatory manner?
 A No, sir, I did not, in fact I envied Judge Pettine's position, I wish I could be him.
 Q I'm sure that you do, sir as a matter of fact, you acted as a judge in this case in refusing to permit the concert to go on.
 MR. FAERBER: I object.
 Q Didn't you, sir?
 A That's your opinion.
 
 
 [6]
 Rule 51 provides:
 At the close of the evidence or at such earlier time during the trial as the court reasonably directs, any party may file written requests that the court instruct the jury on the law as set forth in the requests. The court shall inform counsel of its proposed action upon the requests prior to their arguments to the jury, but the court shall instruct the jury after the arguments are completed. No party may assign as error the giving or the failure to give an instruction unless he objects thereto before the jury retires to consider its verdict, stating distinctly the matter to which he objects and the grounds of his objection. Opportunity shall be given to make the objection out of the hearing of the jury.