Kenneth E. MAYO, Plaintiff, Appellee,

v.

SCHOONER CAPITAL CORP., et al.,
Defendants, Appellants.

No. 86–2128.

United States Court of Appeals,
First Circuit.

Heard May 4, 1987.
Decided July 27, 1987.

Robert M. Buchanan with whom Sullivan & Worcester, Boston, Mass., was on brief, for defendants, appellants.

Henry F. Spaloss for plaintiff, appellee; Arthur O. Gormley, III and Gormley & Kaklamanos, P.C., Nashua, N.H., on brief.

Before COFFIN, ALDRICH and SELYA, Circuit Judges.

COFFIN, Circuit Judge.

In this diversity case, defendants Schooner Capital Corporation ("Schooner") and its president, Vincent Ryan ("Ryan"), appeal a jury verdict of $154,000 in favor of plaintiff-appellee Kenneth E. Mayo ("Mayo") for breach of an oral employment contract. Schooner and Ryan contend that the court erred in denying their motion for judgment notwithstanding the verdict and their motion for a new trial. We find that none of their arguments has merit and therefore affirm the judgment of the district court.

I. *Factual Setting.*

The following facts were adduced at trial. Plaintiff Mayo is a mechanical engineer with considerable experience in the field of hydroelectric power. In January 1980, he met with defendant Ryan and his associate, A. Gail Staker, to discuss potential participation in the formation of a new corpora-

tion for the ownership and development of hydroelectric energy facilities and related activities. (App.187). Mayo testified that Ryan, through his venture capital company, Schooner, sought to fund a study of potential hydroelectric sites in which the new corporation, to be known as Continental Hydro Corporation ("Continental"), could acquire an interest. Mayo described that Ryan, for investment purposes, needed to get a "quick fix" on the largest possible number of hydroelectric sites that could be put into negotiation for acquisition. (App. 204).

On January 24, 1980, according to Mayo, Ryan offered him a three month deal to serve as an engineering consultant at an annual rate of $30,000 plus expenses. (App.186). In addition, Mayo asserts that Ryan—on behalf of himself, Schooner, and Continental—offered him between ten and fifteen percent of the equity in Continental once it was formed. (App.188, 222). Mayo contends that Ryan's offer included a promise to pay Mayo a commission of $20,-000 per megawatt of potential installed capacity of all hydroelectric sites identified by Mayo that were acquirable within three years and that these funds could later be applied to Mayo's purchase of stock in Continental. (App.188). Mayo contends that he accepted this offer and performed the duties required of him by the contract. He explained that the $30,000 annual rate was the bare minimum he could accept for the three month start-up period and that, in essence, he was contributing "sweat equity" in the new venture for which he expected to be compensated at a much higher level in the future. (App.222). At trial, Mayo surrendered his claim to an equity share in Continental, allegedly due to the speculative nature of his damages in that regard, and instead pressed his "straightforward" claim for his commissions based on the potential capacity of the sites he identified for Schooner. (App.248). In his own words: "$20,000 a megawatt of installed capacity potential for acquirable sites; that's the deal." (App. at 299).

Ryan characterized his dealings with Mayo in a very different manner. He claims to have orally offered Mayo *either*

payments for three months at an annual rate of $30,000 plus expenses *or* a commission of $20,000 per megawatt of installed capacity for all sites actually brought on line. (App.262). Ryan testified that Mayo accepted the former offer and rejected the latter, preferring to be paid in salary rather than on a commission basis. (App.262). According to Ryan, therefore, he never entered an oral contract that included a promise to compensate Mayo with an equity share in the new corporation or a commission of $20,000 per megawatt of installed capacity at all acquirable sites.

The parties agree that Mayo served as Ryan's engineering consultant for a three month period and that Schooner compensated him at an annual rate of $30,000 plus expenses. During this period, Mayo estimated that he completed 50 to 75 or more site evaluations and composed detailed reports on those sites he deemed to be desirable for acquisition by Continental. (App. 208–09). The list of desirable hydroelectric sites, according to Mayo, contained 21 proposed acquisitions totalling 40.1 megawatts of potential installed capacity. (App. 211–14). Mayo asserted that a diligent effort by Continental could have resulted in the acquisition of all of these sites within a three year period. (App.213). This list of "acquirable sites" forms the basis for Mayo's claim of contract damages in the amount of $802,000 (40.1 megawatts [2a] $20,000 per megawatt). Mayo testified, however, that as far as he knew, Continental and its affiliates actually acquired only three sites—Spaulding Fiber (2.4 megawatts), Greg Falls (2.5 megawatts), and the Suncook Project (2.8 megawatts)—totalling 7.7 megawatts of potential installed capacity within the three years following his study. (App.211, 301). The testimony regarding the sites actually acquired was undisputed and the jury apparently awarded Mayo damages at the rate of $20,000 per megawatt ($154,000) only for the three "actually acquired" sites.

After serving three months as a consulting engineer, Mayo continued his association with Ryan and Staker even though he was no longer employed by Schooner or

Continental. First, he attempted to negotiate a 25% equity position in Continental, but was unsuccessful in this regard. (App. 265). Eventually, Staker recommended making Mayo president of a company called Water Power Development Corporation ("Water Power") that was one of Continental's state affiliates. Pursuant to the deal that was struck, Mayo became president and his wife became a substantial shareholder in Water Power. (App.264). Mayo retained his position as president of Water Power until July 22, 1981, when, according to a court order, he was removed from office pursuant to a vote of the corporation's stockholders. (App.440–41). The shareholders' vote was apparently engineered by Ryan through the exercise of warrants that permitted Schooner to obtain a controlling interest in Water Power. (App.279). Water Power, which was one of the original defendants in this action, brought and won a counterclaim for misappropriation of funds in the amount of $18,000 in the district court. This portion of the court's judgment has not been appealed.

Defendants offer three arguments aimed at overturning the jury's verdict in favor of Mayo. First, they contend that Mayo failed to prove the existence of an oral contract. Second, they argue that the oral contract implicitly found by the jury is too vague and speculative to be enforceable. Third, they claim that the contract implicitly found by the jury is unenforceable due to the statute of frauds. We treat each of these contentions in turn.

## II. Does The Evidence Support The Existence Of A Contract?

■ The jury found that Mayo was entitled to recover $154,000 for breach of his employment contract. Defendants, however, do not believe that the evidence introduced at trial is sufficient to justify such an award and contend that the district court should have granted their motion for judgment n.o.v. or, in the alternative, their motion for a new trial.

Before considering these arguments, we briefly describe the standards of review to be employed in this case. As to the district court's denial of plaintiff's motion for judgment notwithstanding the verdict, the standard of review is the same as for a denial of a motion for directed verdict: "we must examine the evidence in the light most favorable to the plaintiff and determine whether there are facts and inferences reasonably drawn from those facts which lead to but one conclusion—that there is a total failure of evidence to prove plaintiff's case." *Fact Concerts, Inc. v. City of Newport,* 626 F.2d 1060, 1064 (1st Cir.1980), *vacated on other grounds,* 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981). With regard to the court's denial of defendants' new trial motion, we will reverse only if defendants can "show that the verdict was 'so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice.'" *Jordan v. United States Lines, Inc.,* 738 F.2d 48, 49 (1st Cir.1984) (quoting *Lakin v. Daniel Marr & Son Co.,* 732 F.2d 233, 237 (1st Cir.1984)).

### A. Motion for Judgment Notwithstanding the Verdict.

Defendants begin by challenging the district court's denial of their motion for judgment n.o.v. on the ground that the jury's verdict was not supported by the evidence. They correctly note that the only evidence of the oral contract claimed by Mayo is his own trial testimony. Mayo offered no corroborating witnesses, nor did he introduce any documentary evidence in support of his claim. These facts alone, however, do not require the entry of judgment n.o.v. so long as Mayo's testimony and the inferences that can reasonably be drawn from it support the jury's conclusion.

To support their contention that the verdict is unsupported by the evidence, defendants cite glaring discrepancies between Mayo's redrafted complaint and his testimony at trial. Mayo's complaint first alleges that he would be entitled to at least a ten percent equity share in Continental "as well as" a commission of $20,000 per megawatt capacity "on all dams he identified or analyzed which were *subsequently acquired* by the yet unnamed, unformed company or its assigns within a period of three (3) years." Redrafted Complaint ¶ 9 (em-

phasis supplied). The very next paragraph of the complaint states the terms of the contract differently, alleging that Mayo would receive a one-third ownership interest in the new corporation or, if he chose to terminate his relationship with the venture after the original three month period, a commission of "$20,000 per megawatt." Redrafted Complaint ¶ 10. His testimony at trial was different still from both versions of the contract described in his complaint. Mayo testified that he was entitled to a commission of $20,000 per megawatt of potential installed capacity of all sites he identified that *could have been acquired in the exercise of reasonable diligence* within three years. (App.299).

Defendants contend that Mayo's shifting description of the alleged oral contract renders his trial testimony totally unbelievable. They insist that it is completely "inconceivable that a financer [sic] for a power project would request a list of 'the largest possible number' of potential sites and agree to pay $20,000 per megawatt capacity related to those sites, completely regardless of whether those sites were ever acquired or attempted to be acquired." Defendants' Brief at 22. Defendants add, moreover, that Mayo did not terminate his relationship with the venture at the conclusion of his three month consulting contract. Instead, he stayed on, attempted without success to negotiate for a share of the equity in Continental, and eventually settled on the deal making him president, and his wife a major stockholder, in Water Power. Defendants contend that, under the version of the contract alleged in the Redrafted Complaint, Mayo's decision to continue with the venture should have precluded his collection of the $20,000 per megawatt commission. They suggest that Mayo changed his story at trial and abandoned pursuit of an equity share in Continental because the corporation had ceased to enjoy financial success.

We acknowledge the power of these arguments, but we believe they are addressed to the wrong audience. Although entirely appropriate in the context of a closing argument to the jury, these contentions do not affect our review of the jury's verdict in plaintiff's favor. The variance between Mayo's complaint and trial testimony may very well support the conclusion that his testimony was the product of a flight of fancy. But the jury is the ultimate finder of fact with regard to such issues of credibility and its determination must be respected. On a motion for judgment n.o.v., a court must view all the evidence in the light most favorable to the prevailing party and may not substitute its opinion of witnesses' credibility for that of the jury. *Fact Concerts*, 626 F.2d at 1064.

It is obvious, moreover, that the jury did not accept as true everything that Mayo said on the witness stand. In addition to finding against him on a counterclaim that is not before us on this appeal, the jury also rejected Mayo's suggestion that he was owed a commission on several sites he had recommended to Ryan as desirable acquisitions, but which were not ultimately acquired. Instead, it apparently believed that Mayo was entitled to a commission of $20,000 per megawatt of potential installed capacity only for the three hydroelectric sites actually acquired by Continental or its affiliates. At bottom, this boils down to the jury determining that Mayo's identification of 21 sites as "acquirable" within three years was overly optimistic in light of the other evidence in the case. We are persuaded that the jury acted properly in making this finding based on the available evidence and, hence, see no cause for overturning its verdict.

**B. *Motion for New Trial.***

While Mayo's credibility is completely irrelevant to the motion for judgment n.o.v., the district court could properly have considered this factor in ruling on the new trial motion advanced by defendants. Defendants asserted in their motion to the district court that a new trial was necessary because the jury's verdict was inconsistent, against the weight of the evidence, and represented a miscarriage of justice. *See Borras v. Sea-Land Service, Inc.*, 586 F.2d 881, 886 (1st Cir.1978). On appeal they focus solely on their claim that the verdict was against the clear weight of the evidence because "the proposition that such a contract ever existed between defendants and Mayo is completely unbelievable" and

because "Mayo's own testimony is not creditable, as shown by his shifting allegations concerning the alleged contract, as well as his cavalier misappropriation of corporate assets." Defendants' Brief at 24. Thus, credibility is at the very heart of their demand for a new trial.

We recognize, as we have previously stated, the trial court's "duty to set aside the verdict and grant a new trial if [it] is of the opinion that the verdict is against the clear weight of the evidence, or is based upon evidence which is false, or will result in a clear miscarriage of justice." *Coffran v. Hitchcock Clinic, Inc.*, 683 F.2d 5, 6 (1st Cir.), *cert. denied*, 459 U.S. 1087, 103 S.Ct. 571, 74 L.Ed.2d 933 (1982). Here, however, the district court did not believe that the jury was so derelict in rendering its verdict as to require a new trial and denied defendants' motion. Our review of this decision is necessarily circumscribed, first, by our appreciation of the district court's superior ability to monitor the conduct of the trial and assess the credibility of witnesses, and second, by the jury's constitutionally sanctioned role as finder of fact. Thus, absent a showing that the verdict was "so clearly against the weight of the evidence as to constitute a manifest miscarriage of justice," we will refrain from substituting our view of the evidence for that shared by both the jury and the trial court. *Jordan*, 738 F.2d at 49 (quoting *Lakin*, 732 F.2d at 233).

Given this deferential standard of review and the evidence as described above, we hold that the district court's denial of the new trial motion does not amount to an abuse of discretion. Although the district court admitted that the evidence supporting plaintiff's claim was "awful thin" (App. 255), we believe that it correctly denied defendants' new trial motion because the verdict was not so improper as to constitute a miscarriage of justice and we refuse to overturn this considered judgment.

### III. *Are The Terms Of The Contract Too Vague or Speculative?*

Defendants' second argument assumes that the jury believed Mayo's testimony and found that defendants were contractually obligated to pay Mayo $20,000 per megawatt of potential installed capacity for each recommended dam site that was *acquirable* within three years. Such a contract, argue defendants, would be too vague or speculative to warrant enforcement by a court of law. Defendants specifically complain that the alleged contract (1) does not sufficiently describe Mayo's contractual obligations; (2) does not provide a definitive means by which to ascertain whether a given site was "acquirable;" and (3) does not specify who was to pay the $20,000 per megawatt commission to Mayo. We are unpersuaded that any of these alleged defects precludes enforcement of the oral contract described by Mayo. "While it is true that contracts, both oral and written, must be definite in order to be enforceable, the standard of definiteness is one of reasonable certainty and not 'pristine preciseness.'" *Sawin v. Carr*, 114 N.H. 462, 465, 323 A.2d 924, 926 (1974).

First, we believe there was ample evidence concerning Mayo's performance obligations under the contract. Mayo testified that his job was to serve Ryan and Schooner as a consulting engineer for an initial period of three months and, within that period, he was to get a "quick fix" on "the largest possible number of sites that could be put into negotiation for acquisition." (App.204). Time was of the essence because, as Mayo explained, the idea was to put numerous sites on line and generate income as quickly as possible (App.205), and his job was to provide Ryan, a venture capitalist, with valuable technical information that was essential to Ryan's investment decisions. Defendants are correct that there was little testimony regarding negotiations or agreements between Ryan and Mayo regarding Mayo's specific job duties. Ryan testified, however, that Mayo was to "analyze New England hydro sites for three months" (App.264) and the record is rich with description of the tasks Mayo performed, apparently with Ryan's approval, in this regard. For instance, the record contains no less than twenty pages of testimony by Mayo setting forth the process he used to analyze and evaluate hydroelectric sites. (App.192–204). Mayo also testified that, pursuant to his contract with Ryan and Schooner, he carried out site evalua-

tions on numerous potential sites during his three month consultancy and prepared written reports for Ryan on approximately 20 desirable sites. (App.208–09). Taken in the light most favorable to plaintiff, we believe that this undisputed evidence, along with the inferences that can reasonably be drawn from it, sufficiently describe Mayo's duties under the alleged oral contract.

Second, we find no merit in defendants' contention that the term "acquirable" was too vaguely defined to permit enforcement of the bargain. Mayo specifically testified that the term referred to all hydroelectric sites which, "with a diligent effort[,] ... could have been acquired" by the newly formed corporation within three years. (App.213). We believe that, despite the term's inherent imprecision, it is not so ambiguous as to fall afoul of the "reasonable certainty" standard and cause the contract itself to be unenforceable. True, there was a factual dispute at trial as to which hydroelectric sites identified by Mayo could have been acquired in the exercise of reasonable diligence, but this issue was properly left to the jury. The jury heard evidence regarding the methods of evaluating the capacity and value of hydroelectric sites, the various means of acquiring the rights to such sites, and the need to obtain regulatory approval before operating a site. Having reviewed this evidence, it rejected Mayo's proposed list of 21 sites and found instead that the only "acquirable" sites were the three actually acquired by Continental and its affiliates during the three year period. The factual dispute, therefore, concerned only which sites satisfied the standard set by contractual term. Such a dispute does not render the oral contract unenforceable on vagueness grounds where, as here, the meaning of a term itself is "reasonably certain." *Sawin*, 114 N.H. at 465, 323 A.2d at 926.

Finally, we are not persuaded by defendants' assertion that the failure to specify precisely which party was to pay the commission renders the contract too vague or speculative to be enforced. Mayo first testified that Ryan, acting on behalf of Schooner, said, "what I'll do is I will pay you $20,000 a megawatt of ... the potential installed capacity of the sites." (App.

188). Then, according to Mayo, Ryan went on to say that "Continental Hydro, the new company that is to be formed, will pay that $20,000 a megawatt." (App.188). We admit that Mayo's testimony leaves some confusion as to which party was actually supposed to pay the commission, but given the posture of this appeal we must view the evidence in the light most favorable to Mayo. Mayo did testify regarding his understanding that Ryan entered the contract on behalf of himself, Schooner, *and* the as yet unformed corporation (Continental) which Schooner sought to fund. (App. 222). It is also significant that, at the time the parties entered the oral contract, Continental existed only in the sense that Ryan hoped to form such a corporation in the future to exploit the opportunities identified by Mayo. We are of the opinion, therefore, that the jury could have reasonably believed that the contract called for Ryan and Schooner, not Continental, to be ultimately responsible for paying Mayo's commission. Thus, we hold that the contract is not so vague in this regard as to be unenforceable against the two parties— Ryan and Schooner—who originally made the promise to Mayo.

## IV. *Is The Contract Barred By The Statute Of Frauds?*

■ Defendants' final challenge concerns the enforceability of the alleged oral contract in light of the statute of frauds. According to defendants' theory, the contract to which Mayo testified at trial—involving a commission on all identified hydroelectric sites that could be acquired in the exercise of reasonable diligence within three years—violates that portion of the statute of frauds which requires a writing for agreements that cannot be completed within one year. *See* N.H.Rev.Stat.Ann. § 506:2; *see also* Mass.Gen.L. ch. 259, § 1. Defendants raised this defense for the first time in their motions for judgment n.o.v. and for a new trial.

Mayo's response is that defendants waived reliance on the statute of frauds because they neither pleaded it as an affirmative defense, nor cited it when moving for a directed verdict at the close of plaintiff's case and again at the close of all the

evidence. We have held, pursuant to Federal Rule of Civil Procedure 50(b),[1] that a party may not be awarded judgment notwithstanding the verdict on a ground that was not previously included in a motion for directed verdict at the close of all the evidence. *Martinez Moll v. Levitt & Sons of Puerto Rico, Inc.*, 583 F.2d 565, 568 (1st Cir.1978). As we explained, the prudential rationale underlying Rule 50(b) is that both the opposing party and the court should be on notice of the movant's legal claim prior to the case going to the jury. This ensures that the opposing party will be able to cure any deficiency in his case and permits the judge to rule on the legal sufficiency of the case "without impinging on the jury's fact-finding province." *Id.* at 569.

Defendants seek to escape the operation of Rule 50(b) in this case by asserting that there was no previous occasion on which they could possibly have raised the statute of frauds defense. They attempt to support this contention by noting that Mayo, who had previously been pursuing an equity interest in Continental, changed his theory just prior to trial and sought instead the $20,000 per megawatt commission for all sites acquirable *within three years*. According to defendants, there was no waiver of the statute of frauds defense because they asserted it at the earliest possible opportunity after reviewing the plaintiff's claims as stated at trial.

We cannot accept this rationalization. Plaintiff's pre-trial decision to change his theory of recovery may excuse defendants' failure to plead the statute of frauds defense in their answer, but it does not excuse defendants' inaction after the plaintiff had completed his testimony regarding the alleged oral contract. If defendants truly believed that Mayo's testimony was inconsistent with the allegations of his complaint, then they should have objected to the introduction of this evidence or moved to amend their answer in light of the new theory advanced by plaintiff. Nothing in the record indicates that defendants took such steps. Subsequent to plaintiff's trial testimony, moreover, defendants had two additional opportunities to raise the statute of frauds defense when moving for a directed verdict. Yet defendants, while fully cognizant of the contours of Mayo's contract claim, failed to raise the defense both at the conclusion of the plaintiff's case and at the conclusion of all the evidence. We therefore see no compelling reason to treat their failure to act as anything other than a waiver of the statute of frauds defense.

*For the reasons stated, the judgment of the district court is affirmed.*

---

1. Rule 50(b) states:

    Whenever a motion for directed verdict made at the close of all the evidence is denied or for any reason not granted, the court is deemed to have submitted the action to the jury subject to a later determination of the legal questions raised by the motion.... [A] party who has moved for a directed verdict may move to have the verdict and any judgment entered thereon set aside and to have judgment entered *in accordance with his motion for directed verdict*....

    Fed.R.Civ.P. 50(b) (emphasis supplied).