**Neftali GONZALEZ–MARIN,
Plaintiff, Appellee,**

**v.**

**The EQUITABLE LIFE ASSURANCE
SOCIETY OF the UNITED STATES,
Defendant, Appellant.**

**No. 87–1877.**

United States Court of Appeals,
First Circuit.

Heard March 9, 1988.

Decided May 6, 1988.

---

Joseph Williams, Jr., with whom Edward M. Borges, Jorge I. Peirats and O'Neill & Borges, Hato Rey, P.R., were on brief for defendant, appellant.

Luis R. Mellado–Gonzalez with whom Lorna Rodriguez–Marquez and Mellado & Mellado, Hato Rey, P.R., were on brief for plaintiff, appellee.

Before COFFIN, BOWNES and SELYA, Circuit Judges.

BOWNES, Circuit Judge.

Defendant-appellant, the Equitable Life Assurance Society of the United States (Equitable), contests a jury verdict ordering both the specific performance of a disability income policy and the payment of moral damages to Neftali Gonzalez Marin, the purchaser and beneficiary of the disputed policy. Gonzalez became disabled by catatonic schizophrenia[1] within three months after purchasing the insurance policy. He therefore filed a claim for benefits with Equitable. Although Equitable found Gonzalez disabled within the meaning of the policy, it withheld benefits and sent Gonzalez a notice of rescission. Its reason was that the insured ostensibly had misrepresented his predisability income in his application for insurance and that therefore the policy was unenforceable. Suit was filed on behalf of Gonzalez for reinstatement, back pay benefits and moral damages.[2] On appeal, Equitable alleges numerous errors which raise four distinct issues: (1) the sufficiency of the evidence, (2) the possibility of prejudice resulting from the presence of Gonzalez in the courtroom, (3) the propriety of the closing argument by Gonzalez's counsel, and (4) the amount of the verdict.

---

1. Contrary to popular belief, the term schizophrenia does not denote a split personality. Rather it describes "any of a group of severe emotional disorders characterized by misinterpretation and retreat from reality, delusions, hallucinations, ambivalence, inappropriate affect, and withdrawn, bizarre, or regressive behavior." *Dorland's Illustrated Medical Dictionary* 1386 (25th ed. 1974). Catatonic schizophrenia is a form of schizophrenia often marked by "generalized inhibition." *Id.*

2. The Superior Court of Puerto Rico appointed Manuela Marin de la Rosa, the mother of Gonzalez, as the latter's legal guardian on December 9, 1982. Manuela Marin filed the instant action both on her own behalf and on behalf of her son. On August 11, 1986, the district court found that Manuela Marin had failed to establish any legal ground for her personal claim and it dismissed the complaint filed in her personal capacity.

## I. FACTUAL BACKGROUND

The events leading to the present suit date to July 1981 when Efrain Berrios, a disability insurance salesperson for Equitable, entered the Plaza del Este Cash & Carry in Humacao, Puerto Rico, in search of new clients. Upon requesting to see the manager of the store, Berrios met Neftali Gonzalez Marin. According to the testimony of Berrios, Gonzalez expressed an interest in purchasing disability insurance and agreed to meet with Berrios after working hours.

A few days later, Berrios arrived at the home of Gonzalez to discuss various disability income plans. The nature of their interchange is crucial to the question of misrepresentation. The only evidence concerning the parties' conversation is the testimony of Berrios and Equitable's response to various requests for admission. No person other than Gonzalez and Berrios was present during the conversation, and Gonzalez's illness rendered him incapable of testifying at trial.

Berrios testified that he described two different policies to Gonzalez: one provided benefits of $2,500 per month and the other provided benefits of $3,000 per month. Gonzalez chose the latter option. That plan ensured income during the course of a disability due to illness until the age of sixty-five. The package Gonzalez purchased also included hospitalization benefits.

After helping Gonzalez select a plan, Berrios produced a three-page application form. Gonzalez did not fill out the form; instead, Berrios asked the applicant various questions orally and noted the answers upon the form himself. Berrios testified that he paraphrased some of the questions on the form and that he did not ask others.

The treatment of questions regarding the applicant's income are at the core of the controversy. In paragraph three on the first page of the application form, the following questions appear:

Earnings

a. What is your earned annual income? (Indicate your present yearly salaries, fees and other earned income. If you work on your own, or if you are a member of any partnership, indicate your gross earnings, deducting your current operational expenses disbursed in order to get these earnings).

b. Will you continue to receive any portion of such income during disability?

c. Has your yearly income changed over twenty percent within the last two years?

On the application form, Berrios entered the figure $100,000 in response to part (a) of the question, and he entered "no" in response to parts (b) and (c). Berrios testified that earlier in the interview, when he described the various plans available for disability income, he explained that an applicant must have an annual income greater than or equal to ninety thousand dollars to qualify for the insurance package chosen by Gonzalez. Berrios testified: "I verbally asked him whether he earned that amount of money and he said to me, yes, I earn that amount and more." Berrios did not request any documents confirming that assertion.

After completing the oral inquiry, Berrios handed the application to Gonzalez. Gonzalez signed pages two and three of the form; he did not sign page one—the page upon which the income related questions appeared. Gonzalez then paid his first premium and Berrios departed, taking the sole copy of the application form along with him. Gonzalez did not receive a copy of the application until Equitable issued and delivered the disability income policy on August 28, 1981.

Gonzalez had no further substantive exchange with Equitable until May 9, 1982, when he filed a claim for disability income under both the policy in question and a preexisting policy held by him which provided benefits of $400 per month. The claim for benefits followed the onset of Gonzalez's illness by several months. According to the testimony of his wife, Mirtha Soto, Gonzalez began to demonstrate signs of mental illness in November 1981. In January 1982, Gonzalez sought psychiatric treatment with Dr. Jose Vigoreaux. Dr. Vigoreaux previously had treated Gonzalez

from February 1967 until October 1968 for "emotionally unstable and inmature [sic] personality." Due to the permanent disability of Vigoreaux which followed a stroke in 1978, Gonzalez was referred to and began treatment with Dr. Guillermo Hoyos.

Equitable has never contested that Gonzalez is disabled within the meaning of both disability income policies. On May 29, 1982, Equitable began payments to Gonzalez under the $400 per month policy, but withheld all benefits under the disputed policy. On January 11, 1983, Equitable sent Gonzalez a "notice of rescission" on the grounds of insufficient earnings to qualify for coverage, stating that Gonzalez had never earned more than $30,000 in the three years relevant to the policy. Equitable enclosed, with the notice of rescission, a check refunding all of the premiums paid by Gonzalez. On the advice of counsel, Gonzalez refused the refund.

Suit was filed in the Superior Court of Puerto Rico. Upon Equitable's petition, the case was removed to federal court. On July 9, 1986, the district court issued an opinion and order in response to a joint motion for pretrial determination of two issues of law. The first issue, and the only one relevant to this appeal, involved the interpretation of Article 11.100 of the Insurance Code of Puerto Rico, 26 L.P.R.A. § 1110 (1976), which addresses the effect of misrepresentations in an application for an insurance policy.[3] The court held that the alleged misrepresentation in the case at bar implicated paragraph (3) of the statute: "The insurer in good faith ... would not

have issued a policy in as large an amount ... if the true facts had been made known to the insurer." The court further found that the nexus requirement of the statute, which provides that a misrepresentation will bar recovery only if "such actions or omissions contributed to the loss that gave rise to the action," was met under the facts of the case. The only issue remaining for trial, therefore, was whether or not Gonzalez misrepresented his income on the application for insurance. If he did, then Equitable lawfully rescinded the policy. If he did not, then the statute provided no grounds for rescission and Equitable would be held liable under the policy.[4]

After a five-day trial, the jury rendered a verdict for Gonzalez. It found Equitable liable for reinstatement and back pay benefits under the disability income policy. The jury further found Equitable liable for moral damages in the amount of $800,000 less the amount of $216,000 for failure to mitigate such damages. The award for moral damages was therefore $584,000. On July 16, 1987, the court denied appellant's motions for a new trial and for judgment notwithstanding the verdict. The court found that Gonzalez "had not subjectively or intentionally intended to deceive or defraud the defendant." It therefore ordered that Equitable pay Gonzalez past benefits owed under the policy in the amount of $210,356.64 plus interest. This appeal ensued.

## II. SUFFICIENCY OF THE EVIDENCE

Equitable asserts that uncontradicted evidence introduced at trial demonstrates

---

**3.** The statute provides:

All statements and descriptions in any application for an insurance policy or in negotiations therefor, by or in behalf of the insured, shall be deemed to be representations and not warranties. Misrepresentations, omissions, concealment of acts, and incorrect statements shall not prevent a recovery under the policy unless:

(1) Fraudulent; or

(2) Material either to the acceptance of the risk, or to the hazard assumed by the insurer; or

(3) The insurer in good faith would either not have issued the policy, or would not have issued a policy in as large an amount, or would not have provided coverage with re-

spect to the hazard resulting in the loss, if the true facts had been made known to the insurer as required either by the application for the policy or otherwise.

When the applicant incurs in any of the actions enumerated in paragraphs (1), (2) and (3) of this section, the recovery shall only be prevented if such actions or omissions contributed to the loss that gave rise to the action.

**4.** The second issue addressed by the district court concerned appellee's request for a lump sum recovery. The court found that if plaintiff prevailed, she would be entitled to the specific performance of the insurance contract but not to a lump sum payment.

that Gonzalez failed to earn the minimum income required under the policy in question. It argues that insufficient evidence exists to support the jury award in favor of Gonzalez and that the district court erroneously denied its motions for a directed verdict, judgment notwithstanding the verdict, or in the alternative, a new trial. We disagree.

First we note the standards of review applicable to this case. Appellate review of the denial of a motion for a directed verdict or for a judgment n.o.v. is limited: " 'we must examine the evidence in the light most favorable to the plaintiff and determine whether there are facts and inferences reasonably drawn from those facts which lead to but one conclusion—that there is a total failure of evidence to prove plaintiff's case.' " *Mayo v. Schooner Capital Corp.*, 825 F.2d 566, 568 (1st Cir.1987) (quoting *Fact Concerts, Inc. v. City of Newport*, 626 F.2d 1060, 1064 (1st Cir. 1980), *vacated on other grounds*, 453 U.S. 247, 101 S.Ct. 2748, 69 L.Ed.2d 616 (1981)). Review of the denial of a motion for a new trial is similarly limited. We will review only for an abuse of discretion, recognizing in our review the limited discretion afforded to the trial judge: "[T]he trial judge may set aside a jury's verdict only if he or she believes that the outcome is against the clear weight of the evidence such that upholding the verdict will result in a miscarriage of justice." *Conway v. Electro Switch Corp.*, 825 F.2d 593, 599 (1st Cir. 1987) (citations omitted).

■ The crucial question for the trier of fact in the instant case was whether Gonzalez misrepresented his income within the meaning of Article 11.100 of the Insurance Code of Puerto Rico. In the instructions to the jury, the trial judge defined a misrepresentation as a situation in which the insured "made the statement pertaining to his income knowing it to be untrue, or with total disregard of its veracity, regardless of whether or not he intended to deceive defendant.... " Because the defendant did not object to that definition of misrepresentation, it establishes the contours of our inquiry. We must determine whether suf-ficient evidence exists, reading the facts and all inferences reasonably drawn therefrom in the light most favorable to the plaintiff, to establish that Gonzalez did not knowingly misstate his income or state it with complete disregard for accuracy.

Gonzalez asserts that any inaccuracy in his application was due to errors on the part of Berrios. He points out that he did not see the written question concerning income during the session with Berrios; that Berrios paraphrased many of the questions; that the agent merely asked if Gonzalez made at least $90,000 without specifying gross or net earnings; that Gonzalez responded truthfully in light of his gross income; and that Berrios never inquired as to the income of Gonzalez in the two years prior to the application. Appellant counters that net income is the relevant benchmark; that Gonzalez never made more than $30,000 in the relevant three-year period; and that even if gross income during the one year in question were at issue, Gonzalez simply did not gross in excess of $90,000 as he claimed during the interview with Berrios. To resolve these conflicting assertions, we turn to the evidence presented at trial.

Israel Delgado Ramos, the co-owner of the Plaza del Este Cash & Carry, testified that the insured earned $500 per week with a $2,000 bonus at Christmas. Gonzalez's annual salary therefore totalled approximately $28,000. In addition, Gonzalez earned income from a trucking operation which he began in May 1981. The business involved buying merchandise in bulk at the piers and selling it directly from the trucks to merchants. Gonzalez purchased two trucks and hired drivers to carry out this operation. One of the drivers, Robert Rivera, testified that the daily sales ranged from $3–5,000. The bookkeeper, Norma de Jesus Rivera, the wife of the second driver, Nicasio Rivera, testified that the sales in June totaled $23,649.33, while those in July totaled $27,039.45. Annualizing the lower figure would allow Gonzalez to estimate reasonably a gross income of $283,791.96— well above the $90,000 floor set by Equitable.

Equitable rejects this analysis. It insists upon looking at net income; it points out that the trucking operation generated a profit of merely $9.14 over the two-month summer period. Further, it points to the 1979 tax return of Gonzalez to establish an income of $9,554.85—a figure which varies considerably more than twenty percent from the $90,000 benchmark.

Although Equitable's analysis establishes that the insured's *net* income fell far short of the policy minimum and that his income varied more than twenty percent during the relevant period, it does not establish that Gonzalez *misrepresented* his income. Sufficient evidence exists for the trier of fact to have concluded that Berrios merely inquired as to income, without specifying a three-year time period, which Gonzalez reasonably understood as a query concerning *gross* income, and that the applicant answered truthfully to the best of his knowledge. Given the standards of review which apply, we find that the trial court properly denied Equitable's trial and post-trial motions.

## III. PREJUDICIAL EFFECT OF THE INSURED'S PRESENCE IN THE COURTROOM

Equitable next alleges error in the denials of its motion for bifurcation and its motion in limine to exclude Gonzalez from the courtroom. As to bifurcation, it argues that the trial court should have ordered separate trials for the determination of liability and damages. Equitable reasons that because it never contested the insured's qualification as a disabled person within the meaning of the disability income policy, all evidence of the physical condition of Gonzalez pertained solely to an assessment of damages—not liability. The presentation of such evidence during the liability phase of the trial therefore created unfair prejudice which warrants bifurcation under Federal Rule of Civil Procedure 42(b). As to the motion in limine, Equitable contends that Gonzalez should have been excluded from the courtroom. It characterizes Gonzalez as a piece of demonstrative evidence whose mere presence before the jury created unfair prejudice within the meaning of Federal Rule of Evidence 403. And finally, Equitable asserts that the unauthorized and unsupervised viewing by the jurors of Gonzalez in the hallway outside of the courtroom had an unfairly prejudicial impact which necessitated a mistrial. In sum, Equitable challenges the right of a disabled plaintiff who is incapable of comprehending judicial proceedings to attend his or her own trial.

We begin this analysis by noting the limited standard of review for the denial of a motion to bifurcate. A Rule 42(b) motion is a matter peculiarly within the discretion of the trial court, *see* 5 J. Moore, J. Lucas & J. Wicker, *Moore's Federal Practice* ¶ 42.03[1] (2d ed. 1987); *and* C. Wright & A. Miller, *Federal Practice and Procedure* § 2388 (1971), which we review only for an abuse of discretion. *See Kisteneff v. Tiernan*, 514 F.2d 896, 897 (1st Cir.1975). Although Equitable urges us to find such an abuse in the instant case, it fails to cite a single case in which an appellate court has reversed a decision for failure to bifurcate and we also have been unable to find any.

Our inquiry in the present case is guided by the decision of the Sixth Circuit in *Helminski v. Ayerst Laboratories*, 766 F.2d 208 (6th Cir.), *cert. denied*, 474 U.S. 981, 106 S.Ct. 386, 88 L.Ed.2d 339 (1985). The *Helminski* case involved a products liability action brought by the parents of an autistic child against the manufacturers of a surgical anesthetic for damages allegedly due to *in utero* exposure to the product. During the trial of the case, plaintiffs' counsel announced an intention to call the child as a witness. The court found that the presence of the child in the courtroom would bias the jury against the defendant. The court therefore ordered a bifurcation of the trial on the issues of liability and damages. It further ordered that the child could not be present in the courtroom during the liability phase of the trial. At the end of a six-day trial on liability, the jury returned a verdict of "no cause of action."

*Id.* at 210.[5]

On appeal, the court considered the rulings on bifurcation and exclusion separately. It found first that the trial court did not abuse its discretion by deciding to bifurcate the issues at an advanced stage of the trial proceedings. It then considered the exclusion of the child from the liability phase of the trial. The court stated that although a civil litigant does not possess an absolute right to be present during trial, the exclusion of a litigant does raise due process concerns. The court considered three different scenarios in which a plaintiff might be excluded from the courtroom. The first involved the broad assertion of a right to be present at all phases of a trial; the court found that even if a litigant were represented by counsel, the party could not be excluded arbitrarily from the courtroom. The second scenario involved a litigant whose mere physical presence in the courtroom might bias a jury: for example, a litigant with physical injuries allegedly caused by the defendant. The court found that physical appearance alone does not justify exclusion. Finally, the court considered the case of a plaintiff suffering a mental disability: a disability allegedly caused by the acts of the defendant which rendered the plaintiff incapable of understanding judicial proceedings. The court recognized that the mere presence of such a person in the courtroom might bias a jury and cause it to base its decision upon emotion—thus infringing upon the right to a fair trial. At the same time, the exclusion of a plaintiff who could not comprehend the proceedings or aid counsel would not offend due process. The court therefore concluded that in some circumstances a mentally disabled person incapable of understanding the trial could be excluded properly: "If the court in its discretion determines that the party's presence would, indeed, be prejudicial, the court may bifurcate the proceedings into separate trials on liability and damages, excluding the litigant from the liability phase." 766 F.2d at 217 (citations omitted).

The Sixth Circuit emphasized that a defendant seeking to exclude a handicapped plaintiff bears the burden of establishing prejudice, and that mere prejudice alone does not suffice unless the court is satisfied that the plaintiff cannot comprehend the proceedings. The court found that the defendant in *Helminski* failed to meet its burden:

> Although testimony indicated that Hugh was not toilet trained, could not speak, comprehend the proceedings, or assist counsel, and sometimes emitted frightening sounds, this description is insufficient to establish that the jury would be prevented from or substantially impaired in performing its duty. The analysis absent in this case would focus on the likelihood of Hugh displaying abnormal behavior and the likelihood of this conduct affecting the jury's ability to decide the case on the facts.

*Id.* at 218. The court therefore held that the trial court wrongfully excluded the child from the courtroom.

■ We agree with the ruling of the *Helminski* court that a trial court *may* decide to bar from the courtroom a disabled plaintiff incapable of comprehending judicial proceedings during the liability phase of a trial in order to prevent prejudicing the jury. In the instant case, however, we find no abuse of discretion in the decision of the court below to allow Gonzalez to be present for a limited time during a trial in which the issues of liability and damages were tried together. We base this decision on two factors. First, Equitable's motion in limine to exclude Gonzalez from the courtroom failed to establish the requisite showing of substantial impairment of the jury. The motion contained conclusory allegations of prejudice without setting forth facts which would support a decision to exclude the insured. In fact, the description of Gonzalez at trial by expert witnesses as immobile and noncommunicative undermines any inference of intrusive or disruptive behavior. Second, we note that the district court demonstrated an awareness of the potentially prejudicial

---

**5.** The opinion does not offer an explanation for   the unusual verdict.

effect of the insured's presence in the courtroom. The court ruled initially that Gonzalez could remain in the courtroom only for the five minutes requested by his counsel. The court then directed that counsel bring Gonzalez into the courtroom before the jury entered and wait until after the jury left to take him away in order to avoid attracting undue attention to the helpless condition of the insured. Although the latter directive did extend the period of time which Gonzalez spent in the sight of the jury, it reflected a sensitivity to the parties' conflicting rights of due process and fair trial.

In light of these facts, we find that the denial of appellant's motions to bifurcate and in limine did not constitute reversible error. We further find that the brief view of Gonzalez in the hallway by the jurors did not merit a mistrial. This is not a case in which counsel attempted "to parade a handicapped plaintiff before the jury in a deliberate attempt to elicit sympathy," *Helminski*, 766 F.2d at 218 n. 8; rather, the event was an unanticipated, isolated occurrence. We find no abuse of the trial court's discretion in the denial of Equitable's motions for bifurcation and in limine.

## IV. OVERREACHING IN CLOSING ARGUMENT

Equitable next claims error in two remarks of Gonzalez's counsel during closing argument. It alleges that counsel both misrepresented the evidence and improperly appealed to the jury's emotions by underlining the contrasting financial positions of the parties. Equitable contests the denial of its motions for mistrial.

■ The district court has considerable discretion in supervising attorneys' remarks during closing argument. *See Mitchell v. Weaver*, 806 F.2d 300, 302 (1st Cir.1986). We will reverse only upon a showing of prejudice. *Id.; see also Roy v. Star Chopper Company*, 584 F.2d 1124, 1135 (1st Cir.1978) (inadvertent reference to defendant's insurance carrier in closing argument not reversible error), *cert. denied*, 440 U.S. 916, 99 S.Ct. 1234, 59 L.Ed.2d 466 (1979).

■ We find that the contested remarks did not prejudice Equitable. Both remarks were relatively minor misstatements which were followed immediately by curative instructions from the bench. The first incident involved counsel's characterization of a discussion between Gonzalez and Berrios. Counsel stated: "Neftali [Gonzalez] tells the insurance agent that his annual income, gross estimated, could be estimated at one hundred thousand. If he says that, surely, it was because he was asked." Equitable objected, arguing that Berrios did not ask Gonzalez a direct question about his *gross* income. Equitable contends that Gonzalez construed the disputed question about income incorrectly; he was not misled by the agent. The court acknowledged Equitable's position and cautioned the jury to disregard the misleading statement: "Well, if that's the case. I don't remember, I don't want to make it a memory contest but if that's the case, you recall, then your position is well taken and we will have the jury disregard the fact that this was in response to a question." The second disputed statement concerned the relevance of the insured's income to the issuance of the policy. Counsel stated: "Now, how about the importance of this income? What is the importance? Is it related to the disability? How Equitable was affected or hurt by anything put down in that application by the agent?" Equitable argues that the statement was improper because it appealed to the emotions of the jury by contrasting the financial positions of the parties. In fact, the remark represented an attempt to question the materiality of the income provisions in the insurance application. Although counsel's effort was improper because the district court had settled the question of materiality in its order of July 9, 1986, the court cured any error with an immediate instruction to the jury: "The jury is to disregard the comment with regard to ... the issue of the relationship." In addition, the final instructions to the jury contained a reminder of the equality of the parties:

This case should be considered and decided by you as an action between persons of equal standing in the community and holding the same or similar stations in life. A corporation is entitled to the same fair trial at your hands as is a private individual. The law is no respector of persons and all persons, including corporations, stand equal before the law and are to be dealt with as equal in a court of justice.

We find that these cautionary instructions cured any possible prejudice which may have resulted from the challenged statements. We find no reversible error.

## V. EXCESSIVE DAMAGES

Equitable next claims that the amount of moral damages awarded by the jury is excessive and necessitates either remittitur or a new trial. It argues that the verdict of $584,000 grossly deviates from judgments for similar injuries rendered both in state court in Puerto Rico and in other jurisdictions. We disagree.

Under the substantive law of Puerto Rico, a court may award moral damages for the mental and emotional suffering of a party which follows as a foreseeable consequence of a defendant's acts or omissions. *Pereira v. International Basic Economy Corp.*, 95 P.R.R. 28, 54–59 (1967). Gonzalez's "foreseeable consequence" claim is that Equitable's failure to pay aggravated his prior existing condition, that if Equitable had paid promptly he could have afforded medical and hospital care that would have arrested the advance of his illness. Equitable does not contest the basis for the aggravation claim, it challenges only the amount of the jury award. It argues that assessing damages of $584,000 for the failure to pay timely disability benefits under the disputed insurance policy amounts to an imposition of punitive damages which are disallowed under Puerto Rican law. *See Marina Industrial, Inc. v. Brown Boveri Corp.*, 114 D.P.R. 64 (1983).

The Supreme Court of Puerto Rico considered the nature of moral damages in *Pereira*, 95 P.R.R. 28, a case in which plaintiffs sued the principals of a housing development for defects in homes which

they had purchased. The court upheld the award of moral damages in the amount of $1,500 to some claimants and $2,500 to others. It stated:

The examination of the evidence we have made convinces us that the trial judge had ample justification to conclude that claimants suffered moral damages. It is obvious that families of limited income who acquire houses of new construction, with the great illusion of being able to acquire their own houses constructed in a certain architectural style and attractively finished as they could gather from examining the model house, would fee frustrated and humiliated, distraught with worries and anguish, fearing for the health of their children, and suffer many substantial inconveniences ... because of the distressing picture represented by the defects in their houses which we have previously described.

Despite the potentially far reaching language of the opinion, Equitable cites the case as precedent for a conservative approach to moral damages because of a cautionary note struck by the court in its response to a motion for reconsideration:

Now then, it is fitting to state that when granting compensation for moral damages in this kind of actions [sic] the judges should carefully consider the same, limiting it to those cases in which the conditions of the construction have appreciably affected the emotional conditions of the claimant. Not every defect of construction which binds the constructor to repair entails the granting of moral damages. The defects must be of such a nature as to affect the psychic condition of a person.

*Id.* at 80–81 (on motion for reconsideration). That cautionary language, however, pertains solely to actions arising out of negligent or wrongful construction. In the opinion itself, the court cites authority calling for broad discretion at the trial court level in the assessment of moral damages:

[I]t seems doubtless that the compensation for moral damages which do not result in immediate material loss must be submitted to a juridical order different

from that governing damages properly patrimonial: the requirements affecting the causal nexus and the evidence of the moral damages must be treated with less rigor than when material damages are involved, and *an ample discretion should be granted to the courts for weighing them.*

*Id.* at 58 (quoting III Castan, *Derecho Civil Espanol, Comun y Foral, Derecho de Obligaciones* 177–179 (9th ed. 1958)) (emphasis added).

■ Not only has Equitable overstated the mandate for conservatism in *Pereira,* but also it has questioned our opinion in *LaForest v. Autoridad de las Fuentes Fluviales de Puerto Rico,* 536 F.2d 443 (1st Cir.1976), in which we rejected a request for active review of a damage award which included recompense for mental suffering, anguish and loss of companionship. The defendant in *LaForest* claimed that the award of $210,000 in a wrongful death action was excessive in light of local precedent. We held: "A federal jury ... is not bound in making its determination by the amount that the Commonwealth courts have awarded or approved." *Id.* at 446–47 (citations omitted). We further stated that in reviewing a jury award rendered in a district court sitting in Puerto Rico, we must apply the same standards as used in assessing other civil jury awards. That is the award must stand "unless 'grossly excessive' or 'shocking to the conscience.'" *Id.* at 447.

Equitable suggests that the outcome mandated by *LaForest* raises a question as to the validity of jury trials in civil diversity cases in federal court. It argues that the resultant high damages demonstrate the danger of imposing jury trials in a system accustomed to trying all civil cases before a judge: great disparities in judgments will arise and forum shopping will be encouraged. This argument appears to be raised inappropriately by Equitable since Equitable itself requested removal to federal court. That fact aside, we have already considered and rejected Equitable's argument in *Marshall v. Perez Arzuaga,* 828 F.2d 845 (1st Cir.1987), *cert. denied,* ——

U.S. ——, 108 S.Ct. 1027, 98 L.Ed.2d 991 (1988):

For if Puerto Rico's practice of judicially determined damages is deemed to be intimately "bound up" with the substantive rules of ... Puerto Rico's civil law[,] ... the right to jury trial in diversity cases in federal court in Puerto Rico would be no more.

We share the ... concern about the forum shopping our decision apparently invites.... But we have held before that ... disparity in damages awards in the federal courts and the commonwealth courts is insufficient to warrant a deviation from the principles of federal common law.

*Id.* at 849–50 (citations omitted).

■ Our inquiry, therefore, is limited to a single question: Does the jury award of $584,000 grossly exceed the norm so as to shock the conscience. We find that it does not. Gonzalez's claim for moral damages is grounded on the assertion that had Equitable paid disability benefits to him on May 29, 1982, when it commenced payment under the $400 per month policy, the progression of his illness could have been halted and the chances of his recovery would have been improved substantially. Testimony during trial established the following facts which support that assertion. Gonzalez's wife stated that her husband began to demonstrate signs of illness in late November of 1981. As a result of his increasing disturbance, Gonzalez visited Dr. Hoyos for the first time on April 29, 1982. At that time, Hoyos diagnosed a "severe anxiety disorder with psychotic components"; he ruled out a schizophrenia disorder. By August 7, 1982, when Gonzalez paid his fourth visit to Hoyos, the doctor suspected an ongoing psychotic process and began to consider hospitalization. Soon thereafter, Gonzalez had to leave his wife and move into his parents' home in order to receive constant care. Despite his parents' attention, Gonzalez deteriorated and on November 20, 1982, he had a "fit" or a "crisis attack" in the doctor's office. That event led Hoyos to recommend hospitalization. Less than one month later, on December 11, 1982, Gonzalez was confined to a wheel-

chair and diagnosed as a catatonic. As Dr. Hoyos explained: "[C]atatonic is one of the states of the schizophrenia condition, and it's the kind of condition in which the patient can be completely paralyzed ... or not moving at all. He sits in a definite position, in a definite posture. And usually he might remain that way for a long period of time."

Gonzalez contends that if he had collected disability income and hospitalization benefits in a timely manner, he would have received the psychiatric care necessary to arrest the progression of his illness. Dr. Hoyos testified as to the benefits of hospitalization. He stated that if Gonzalez had been hospitalized beginning in November 1982, he would have enjoyed a fifty percent chance of recovery. However, at the time of trial, Hoyos stated that any improvement in the condition of Gonzalez would be difficult because the illness had become chronic. Similarly, Dr. Llado, an expert witness, testified that the delay in hospitalization of Gonzalez had reduced his chances of recovery from thirty-three percent to between ten and fifteen percent.

Hospitalization for psychiatric care was available to Gonzalez in 1982 both at a private and at a state institution. The former cost approximately $300 per day and Gonzalez's mother testified that the family simply could not afford that expense without the insurance proceeds. Equitable contends that Gonzalez should have been placed in the state hospital. Testimony of both Gonzalez's mother and Hoyos, however, established that conditions in the state hospital were deplorable and justified a reluctance to place Gonzalez therein. Furthermore, as the trial court instructed the jury, the decision on the part of Gonzalez's parents to keep their son home rather than to place him in a questionable institution cannot be imputed to Gonzalez.

Sufficient evidence thus exists to find that the failure of Equitable to honor the disability income policy led to an acceleration of Gonzalez's illness and a reduction in his chances for recovery. Further testimony established the degree of pain and anguish which Gonzalez suffered. Since

1982 he has been confined to a wheelchair and has lost all ability to communicate with those around him. As for physical suffering, Dr. Hoyos testified that the medication he prescribed for Gonzalez induced numerous side effects, including hypertension, low blood pressure, rigidity of the extremities, restlessness, spasms, dermatitis, organ symptons and drowsiness. A neurologist, Dr. Victor Mojica, confirmed that Gonzalez had suffered no neurological damage and was therefore entirely capable of experiencing physical suffering. Finally, Dr. Llado testified as to the potential mental and emotional anguish of Gonzalez: "I believe he is definitely capable of experiencing suffering.... [T]he same kind of suffering any human being can experience. What we call psychic pain or emotional pain, emotional distress."

Equitable argues that despite the evidence of Gonzalez's illness presented at trial, the damage award is unconscionable. It contends that the holding in *Bonn v. Puerto Rico International Airlines*, 518 F.2d 89 (1st Cir.1975), governs this case. *Bonn* involved actions for wrongful death and survival arising out of an airplane crash. Defendants admitted liability and the case was tried solely on the issue of damages. The jury awarded the decedents' three children a sum of $1,045,000 for pain, suffering and mental anguish. On appeal, defendants contended that the award was excessive. After reviewing the evidence, we found the verdict unconscionable and remanded for a new trial.

Equitable asserts that the facts in *Bonn* closely parallel those herein at issue. In both cases, plaintiffs suffered psychological injuries due to the acts or omissions of defendants. Also the record in each case contained evidence that the psychological condition may have predated the event giving rise to the cause of action and that defendants merely aggravated a preexisting problem. Although we acknowledge these similarities, we note one glaring difference which distinguishes the cases: the severity of the illness. The plaintiffs in *Bonn* suffered from anxiety and depressive neuroses due to the death of their parents. Gonzalez on the other hand suf-

fers from catatonic schizophrenia: a disease which Dr. Hoyos described as one of the most severe types of schizophrenia. Moreover, the plaintiffs in *Bonn* had "a fair chance of recovery." *Id.* at 94. Conversely, testimony of two expert witnesses in the present case establishes that Gonzalez's chances of recovery range from "nil" to ten to fifteen percent.

Finally, Equitable argues that the recent case of *Riley v. Rodriguez de Pacheco*, 87 J.T.S. 109 (1987), *reprinted in* Appellant's Brief, demonstrates the excessiveness of the damage award herein at issue. The plaintiff in *Riley* sued on her own behalf and on behalf of her daughter for damages resulting from medical malpractice during childbirth. The child suffered from *anoxic encephalopathy*—a degenerative illness resulting from a cerebral injury. The court awarded Riley $100,000 for mental suffering, $30,000 for loss of income and $8,352 for medical expenses. It awarded the child $500,000 for physical injuries and $300,000 for past and future moral sufferings. On appeal, the Supreme Court of Puerto Rico upheld the award to the mother and reduced the child's total award from $800,000 to $400,000—without distinguishing between physical and mental damages. We simply do not find the award of $584,000 to Gonzalez "grossly excessive" or "shocking to the conscience" in light of the *Riley* case. No grave disparity exists between the awards which might cause us to identify a manifest abuse of discretion. *See Bonn v. Puerto Rico International Airlines*, 518 F.2d at 94.

After a thorough review of the record and of awards granted in numerous jurisdictions for similar injuries, *see* Annotation, *Excessiveness or Adequacy of Damages Awarded for Injuries to Head or Brain, or for Mental or Nervous Disorders*, 14 A.L.R. 4th 328 (1982), we find that the trial court's decision to uphold the verdict was not an abuse of discretion. We therefore deny Equitable's alternative requests for a new trial or remittitur.

We have reviewed all the other claims raised by the parties, including appellee's request for attorney fees, and we find them to be without merit. The judgment of the district court is

AFFIRMED.