April 28, 1994 UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1106

ERIC CLAUSEN,

Plaintiff, Appellee,

v.

SEA-3, INC.,

Defendant, Appellee.

ERRATA SHEET

The opinion of this Court issued on April 19, 1994, is
amended as follows:

On page 14, line 3 of first paragraph of section II, add an
"ly" to "perpendicular".

On page 20, last line, replace "the" with "a."

On page 46, line 2 of part "2.", replace "motion to alter or
amend the judgment to "Motion to Alter or Amend a Judgment."

UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT

No. 93-1106

ERIC CLAUSEN,

Plaintiff, Appellee,

v.

SEA-3, INC.,

Defendant, Appellee.

STORAGE TANK DEVELOPMENT CORPORATION,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF NEW HAMPSHIRE

[Hon. Howard C. Bratton,* U.S. Senior District Judge]

Before

Boudin Circuit Judge,

Coffin and Campbell, Senior Circuit Judges.

Robert L. Elliott with whom Charla Bizios Labbe and Kfoury &

Elliott, P.C. were on brief for Sea-3, Inc.

Thomas E. Clinton with whom Robert J. Murphy was on brief for

Storage Tank Development Corporation.
Michael B. Latti with whom David F. Anderson and Latti Associates

were on briefs for plaintiff.

April 19, 1994

*Of the U.S. District Court for the District of New Mexico, sitting by
designation.

CAMPBELL, Senior Circuit Judge. On February 6,

1989, Eric Clausen ("Clausen"), plaintiff-appellee, slipped,

fell, and injured his back while working as a pile driver at

a job site at a fuel terminal facility on the Piscataqua

River, Portsmouth Harbor, Newington, New Hampshire. A

Massachusetts resident, Clausen sued for negligence, under

the diversity jurisdiction, in the United States District

Court for the District of New Hampshire. Defendants were the

owner of the facility, Storage Tank Development Corp.

("Storage Tank"), a New Hampshire corporation, and the

occupier of the facility, Sea-3, Inc. ("Sea-3"), a Texas

corporation. Defendants filed third-party complaints against

Clausen's employer, Goudreau Construction Corp. ("Goudreau").

Clausen's claims went to trial beginning on October

5, 1992. Storage Tank's and Sea-3's third-party claims

against Goudreau were omitted from that trial.1 On October

9, 1992, the jury returned a special verdict in Clausen's

favor, pursuant to Fed. R. Civ. P. 49(a), finding him to have

been damaged in the amount of $1,426,000.2 On October 13,

1992, the district court entered judgment in accordance with

the special verdict. On December 31, 1992, the district

1. The district court ordered a separate trial of the
defendants' third-party claims against Goudreau pursuant to
Fed. R. Civ. P. 42(b).

2. Responding to special questions, the jury apportioned
liability against Storage Tank at 37.5%, Sea-3 at 37.5%, and
Goudreau at 25%.

-3-

court clarified its October 13, 1992, judgment to hold Sea-3

and Storage Tank jointly and severally liable to Clausen for

$1,426,000, with prejudgment interest at the rate of ten

percent (10%) from the date of the complaint to the date of

the verdict, plus costs. On January 22, 1993, Sea-3 and

Storage Tank filed separate notices of appeal from the

district court's December 31, 1992, amended judgment.3 We

affirm.

I.

APPELLATE JURISDICTION

Clausen argues that we do not have appellate

jurisdiction over Storage Tank's appeal because the district

court's December 31, 1992, amended judgment was not an

appealable "final decision" as that term is used in 28 U.S.C.

1291 (1988).4 We trace the procedural history.

When Storage Tank filed its notice of appeal on

January 22, 1993, from the district court's December 31,

3. On March 1, 1994, Sea-3 and Clausen reached a settlement
agreement in which Sea-3 agreed to withdraw its appeal.
Accordingly, on March 7, 1994, we entered an order dismissing
Sea-3's appeal pursuant to Fed. R. App. P. 42(b). Hence,
Storage Tank remains the sole appellant.

4. 28 U.S.C. 1291 (1988) states in pertinent part:

The courts of appeals (other than the United
States Court of Appeals for the Federal Circuit)
shall have jurisdiction of appeals from all final

decisions of district courts of the United States .

. . .

(emphasis added).

-4-

1992, amended judgment, its own unresolved, third-party

claims were still pending against Goudreau. This situation

was problematic because a judgment

that completely disposes of . . . any separate
claim in the suit[,] without disposing of the
third-party claim, is not appealable unless a
judgment is entered by the district court [pursuant
to Fed. R. Civ. P. 54(b)5] on the express
determination that there is no just reason for
delay, and an express direction for the entry of
judgment.

6 James W. Moore et al., Moore's Federal Practice 54.36 (2d

ed. 1993). As the district court had not yet entered an

appealable judgment within Fed. R. Civ. P. 54(b), this court

advised Storage Tank, by order entered February 9, 1993, that

"[u]pon review of the record in this case, it appears that

this court may not have jurisdiction to consider the appeal

because a third party complaint . . . may be outstanding."

We directed Storage Tank "either to move for voluntary

dismissal under Fed. R. App. P. 42(b) or to show cause why

[its] appeal should not be dismissed."

5. Fed. R. Civ. P. 54(b) states in pertinent part:

When more than one claim for relief is
presented in an action, whether as a claim,
counterclaim, cross-claim, or third-party claim, or
when multiple parties are involved, the court may
direct the entry of a final judgment as to one or
more but fewer than all of the claims or parties
only upon an express determination that there is no
just reason for delay and upon an express direction
for the entry of judgment.

-5-

Following our February 9, 1993, show cause order,

Clausen on February 19 moved the district court to "certify

[pursuant to Fed. R. Civ. P. 54(b)] that the judgment entered

on October 13 and amended on December 31, 1992[,] is a `final

judgment' and `that there is no just reason for delay.'"

Storage Tank then moved this court for additional time to

respond to our February 9, 1993, show cause order. On March

4, 1993, we granted appellant's motion, extending the time

within which Storage Tank could respond to our February 9,

1993, order until March 23, 1993. In our March 4, 1993,

order we instructed Storage Tank that, "[i]f the district

court certifies its [judgment] as final pursuant to Rule

54(b), then, in order to avoid any . . . doubts [over

jurisdiction], appellant[] should file [a] new notice[] of

appeal."

On March 31, 1993, over objection by the appellant

and after oral argument, the district court entered an order

in which it found, pursuant to Fed. R. Civ. P. 54(b), "that

the judgment entered on December 31, 1992, in favor of Eric

Clausen and against Storage Tank . . . is a final judgment

and that there is no just reason for delaying appellate

review." Notwithstanding our earlier direction that, to

avoid jurisdictional complications, Storage Tank submit a new

notice of appeal following the district court's Fed. R. Civ.

-6-

P. 54(b) certification, Storage Tank did not take such

action.

Clausen now contends that as Storage Tank's notice

of appeal filed on January 22, 1993, more than two months

prior to the district court's entry of judgment pursuant to

Fed. R. Civ. P. 54(b) was premature, it should be treated

as a nullity.6 Clausen is undoubtedly correct that Storage

Tank's notice of appeal filed after the district court's

6. Clausen cites Willhauck v. Halpin, 919 F.2d 788 (1st Cir.

1990), for the proposition that "a Notice of Appeal which is
premature ``simply self-destructs'' and should be treated as
a nullity." Id. at 792 (quoting Griggs v. Provident Consumer

Discount Co., 459 U.S. 56, 61, 103 S. Ct. 400, 403, 74 L. Ed.

2d 225, 229 (1982) (quoting 9 James W. Moore et al., Moore's

Federal Practice 204.12[1] (1982))). This "nullity"

principle, however, does not apply to this case. In
Willhauck, unlike here, we dismissed the plaintiffs' initial

appeal on the merits of the case for want of jurisdiction
because "the plaintiffs filed their Notice of Appeal from the
district court's denial of their Motion for Judgment
Notwithstanding the Verdict, or in the Alternative, for a New
Trial, one day prior to the lower court's entry of judgment
on the Motion." Id. at 790 n.2. The fact that the district

court had not yet entered judgment on motions filed pursuant
to Fed. R. Civ. P. 50(b) and/or 59 when the Willhaucks filed
their notice of appeal was dispositive because, under Fed. R.
App. P. 4(a)(4) (pre 1993 amendment), a notice of appeal

shall have no effect if it is filed before the disposition of

a motion

(i) for judgment under Rule 50(b); (ii) under Rule
52(b) to amend or make additional findings of fact,
whether or not an alteration of the judgment would
be required if the motion is granted; (iii) under
Rule 59 to alter or amend the judgment; or (iv)
under Rule 59 for a new trial.

Significantly, Fed. R. App. P. 4(a)(4) does not expressly
nullify a notice of appeal filed before the disposition of a
Fed. R. Civ. P. 54(b) motion.

-7-

entry of its amended judgment, but before its Fed. R. Civ. P.

54(b) certification, was premature. See, e.g., Tidler v. Eli

Lilly & Co., 824 F.2d 84, 85 (D.C. Cir. 1987). The amended

judgment was unappealable until the district court

"direct[ed] the entry of a final judgment . . . upon an

express determination that there is no just reason for delay

and upon an express direction for the entry of judgment."

Fed. R. Civ. P. 54(b). This was eventually done, and we are

at a loss as to why Storage Tank's attorney failed to follow

our instruction to file a new notice of appeal following the

district court's Fed. R. Civ. P. 54(b) certification.7 We

conclude, nonetheless, that the prematurity of Storage Tank's

notice of appeal does not deprive us of jurisdiction over the

current appeal.

The majority of circuits that have addressed

jurisdictional quagmires similar to this one have held that a

belated Fed. R. Civ. P. 54(b) certification ripens a

premature notice of appeal as of the date of the

certification. See, e.g., United States v. Hardage, 982 F.2d

1491, 1494-95 (10th Cir. 1993); Harrison v. Edison Bros.

Apparel Stores, Inc., 924 F.2d 530, 532 (4th Cir. 1991); In

re Chateaugay Corp., 922 F.2d 86, 91 (2d Cir. 1990); Martinez

7. Had Storage Tank properly followed our instructions, it
would have filed a new notice of appeal "with the clerk of
the district court within 30 days of" the district court's
entry of judgment pursuant to Fed. R. Civ. P. 54(b). See

Fed. R. App. P. 4(a)(1).

-8-

v. Arrow Truck Sales, Inc., 865 F.2d 160, 161-62 (8th Cir.

1988); Crowley Maritime Corp. v. Panama Canal Comm'n, 849

F.2d 951, 954 (5th Cir. 1988); Tidler v. Eli Lilly & Co., 824

F.2d 84, 85-86 (D.C. Cir. 1987); Aguirre v. S.S. Sohio

Intrepid, 801 F.2d 1185, 1189 (9th Cir. 1986); Lac Courte

Oreilles Band v. Wisconsin, 760 F.2d 177, 180-81 (7th Cir.

1985). But see Useden v. Acker, 947 F.2d 1563, 1570 (11th

Cir. 1991), cert. denied, 113 S. Ct. 2927, 124 L. Ed. 2d 678

(1993); Haskell v. Washington Township, 891 F.2d 132, 133

(6th Cir. 1989). In reaching this decision, the circuits

"follow the same relation forward principle as is provided by

[Fed. R. App. P.] 4(a)(2),8 [although they] do not generally

refer to that rule." Allan Ides, The Authority of a Federal

District Court to Proceed After a Notice of Appeal Has Been

Filed, 143 F.R.D. 307, 316 (1992) (footnote not in original).

8. Fed. R. App. P. 4(a)(2) (pre 1993 amendment) states:
"Except as provided in (a)(4) of this Rule 4, a notice of
appeal filed after the announcement of a decision or order
but before the entry of the judgment or order shall be
treated as filed after such entry and on the day thereof."
According to the United States Supreme Court:

Rule 4(a)(2) was intended to codify a general
practice in the courts of appeals of deeming
certain premature notices of appeals effective. . .
. The Rule recognizes that, unlike a tardy notice
of appeal, certain premature notices do not
prejudice the appellee and that the technical
defect of prematurity therefore should not be
allowed to extinguish an otherwise proper appeal.

FirsTier Mortgage Co. v. Investors Mortgage Ins. Co., 498

U.S. 269, 273, 111 S. Ct. 648, 651, 112 L. Ed. 2d 743 (1991).

-9-

The Tenth Circuit, however, specifically referred to Fed. R.

App. P. 4(a)(2) in its holding that, "[w]hen the district

court case is still ongoing at the time the appeal reaches

this court's attention, . . . [and] a belated Rule 54(b)

certification has been obtained . . . after the notice of

appeal was filed, we will deem the notice of appeal to ripen

as of the date of certification and will accept the

jurisdiction pursuant to the savings provision of Fed. R.

App. P. 4(a)(2)." Lewis v. B.F. Goodrich Co., 850 F.2d 641,

645 (10th Cir. 1988). The Fifth Circuit has stated that

"giving effect to the premature notice of appeal [after a

belated Fed. R. Civ. P. 54(b) certification has been

obtained] is in the spirit of Fed. R. App. P. 4(a)(2)."

Metallurgical Indus., Inc. v. Fourtek, Inc., 771 F.2d 915,

916 (5th Cir. 1985). Hence, while the problem might also be

tackled from some other direction, Fed. R. App. P. 4(a)(2)

suggests that a premature notice of appeal relates forward to

the date of a subsequent Fed. R. Civ. P. 54(b) certification.

Clausen argues, however, that, by virtue of a

recent ruling by the United States Supreme Court in FirsTier

Mortgage Co. v. Investors Mortgage Insurance Co., 498 U.S.

269, 111 S. Ct. 648, 112 L. Ed. 2d 743 (1991), Fed. R. App.

P. 4(a)(2) cannot rescue Storage Tank's prematurely filed

appeal. There, the Supreme Court decided that, "under [Fed.

R. App. P. 4(a)(2)], a premature notice of appeal relates

-10-

forward to the date of entry of a final `judgment' only when

the ruling designated in the notice is a `decision' for

purposes of the Rule." FirsTier, 498 U.S. at 274 n.4

(emphasis added). Although Clausen argues to the contrary,

we believe that the district court's December 31, 1992,

amended judgment was sufficiently a "decision" for purposes

of Fed. R. App. P. 4(a)(2).

In FirsTier, the petitioner filed its notice of

appeal on February 8, 1989, after the district court had

announced from the bench, on January 26, 1989, that it

intended to grant summary judgment for the respondent. On

March 3, 1989, the district court entered judgment. The

question addressed by the Court was whether the district

court's bench ruling was a "decision" under Rule 4(a)(2) so

that the petitioner's premature notice of appeal would relate

forward to the date of the judgment, thereby conferring

jurisdiction upon the court of appeals. In finding that the

bench ruling was a "decision" under Rule 4(a)(2), and that

the court of appeals had jurisdiction to entertain the

appeal, the Court held that "Rule 4(a)(2) permits a notice of

appeal from a nonfinal decision to operate as a notice of

appeal from the final judgment only when a district court

announces a decision that would be appealable if immediately

followed by the entry of judgment." Id. at 276 (emphasis in

original). The Court qualified this principle by explaining

-11-

that Rule 4(a)(2) does not permit a "notice of appeal from a

clearly interlocutory decision such as a discovery ruling

or a sanction order under Rule 11 of the Federal Rules of

Civil Procedure to serve as a notice of appeal from the

final judgment." Id.

In this case, the district court's December 31,

1992, amended judgment was not literally a decision that

would be appealable if immediately followed by the entry of

judgment. This is because, with third-party claims as yet

unresolved, the December 31, 1992, amended judgment did not

dispose of all the claims in the case. Therefore, judgment

could not perfunctorily be entered following the ruling

absent the certification called for by Fed. R. Civ. P. 54(b).

To certify, the district court had to make an express

determination of no just reason for delay. Only having done

so was it free to enter a final judgment upon its December

31, 1992, amended judgment. Thus, the December 31, 1992,

amended judgment here does not, at first blush, seem to fit

within the Court's language in FirsTier and its progeny

indicating that a decision that would be appealable when

immediately followed by the entry of judgment is one that

"form[s] the basis of a final judgment without subsequent

intervention by the district court." Serine v. Peterson, 989

F.2d 371, 373 (9th Cir. 1993); see Strasburg v. State Bar, 1

F.3d 468, 472 (7th Cir. 1993) ("Whereas the district court in

-12-

FirsTier had only ministerial functions left to complete

after announcing summary judgment, the district court's order

here notified the parties that they should expect further

dispositive rulings by the court.").

On the other hand, the nonfinal December 31, 1992,

amended judgment in this case was not irremediably

interlocutory as were the examples the Court used in FirsTier

to describe rulings the premature appeal from which Fed. R.

App. P. 4(a)(2) cannot cure. The examples given were a

discovery ruling or a sanction order under Rule 11 of the

Federal Rules of Civil Procedure. There is no commonly used

procedure for transforming such interlocutory rulings into

appealable, final dispositions, as Rule 54(b) allows in the

instance of decisions that dispose of some, but not all, of

the claims in a case. Thus, the district court's amended

judgment in this case falls somewhere along the continuum

between an unalterably interlocutory decision, the notice of

appeal from which can never serve as a notice of appeal from

the final judgment, FirsTier, 498 U.S. at 276, and decisions

that would be appealable under Rule 4(a)(2) when immediately

followed by the entry of judgment. We ask, therefore,

whether the district court's amended judgment is close enough

to a "decision that would be appealable if immediately

followed by the entry of judgment," id., to be a "decision"

-13-

for purposes of Fed. R. App. P. 4(a)(2). Our answer is

"Yes."9

The district court's December 31, 1992, amended

judgment bears far more similarity to a decision that would

be appealable if immediately followed by the entry of

judgment than to the purely interlocutory decrees described

in FirsTier. Unlike these, the December 31, 1992, amended

judgment was a decision that purported to dispose finally of

all of Clausen's claims against Storage Tank, if not all the

claims in the lawsuit. The decision lacked finality only

because the district court had to find that there was no just

reason for delay and certify it as appealable immediately

pursuant to Fed. R. Civ. P. 54(b). Although this required

the district court to make an additional finding concerning

the appropriateness of an immediate appeal, that finding did

not affect the substance or the scope of the amended judgment

from which the premature appeal was taken. Rather, once

made, the district court's Fed. R. Civ. P. 54(b) ruling

instantly converted the substance of the former interlocutory

amended judgment into a wholly appealable one without

modifying or enlarging that decision in any way.

9. FirsTier, of course, did not involve Fed. R. Civ. P.

54(b); hence, the Court should not necessarily be expected to
have anticipated the niceties of the present situation, which
is sui generis.

-14-

The primary difference between the December 31,

1992, decision in this case and the bench ruling in FirsTier

was that the district court here could not perfunctorily

enter judgment under Fed. R. Civ. P. 58. Rather, it had to

satisfy itself and certify that the decision was, in effect,

appropriate for immediate appeal, pursuant to Fed. R. Civ. P.

54(b), notwithstanding its failure to resolve all claims made

in the lawsuit.10 This difference, however, does not make

the district court's December 31, 1992, amended judgment so

dissimilar from the district court's bench ruling in FirsTier

that Storage Tank should lose the protection of the savings

clause of Fed. R. App. P. 4(a)(2). In both instances, the

prematurely-appealed decisions remained absolutely unaltered

to and through entry of an appealable judgment.

Consequently, we hold that, by virtue of Fed. R.

App. P. 4(a)(2), Storage Tank's premature notice of appeal

ripened when the district court certified its December 31,

1992, amended judgment pursuant to Fed. R. Civ. P. 54(b). As

we have appellate jurisdiction, we turn to the merits of the

appeal.

II.

10. It could be said that, for the purposes of Fed. R. App.
P. 4(a)(2), a Fed. R. Civ. P. 54(b) certification plays the
same role as entry of judgment under Fed. R. Civ. P. 58. In
other words, "entry of judgment," as that phrase appears in
Fed. R. App. P. 4(a)(2), encompasses Fed. R. Civ. P. 54(b)
certifications.

-15-

BACKGROUND

Storage Tank owns docking facilities along the

Piscataqua River in Newington, New Hampshire. These include

a walkway-pier that first extends perpendicularly from the

shore line into the water, and then turns ninety degrees to

the left and extends upstream. A concrete mooring cell,

referred to as Cell Three, is located in the water beyond the

end of the walkway-pier.11 Cell Three, at the time of

Clausen's injury, was connected to the end of the walkway-

pier by the ramp upon which Clausen slipped and fell. The

ramp sloped downward to Cell Three from the walkway-pier. In

April 1992, the ramp was replaced by Storage Tank, at Sea-3's

request, with a set of steps because the concrete cell cap

had settled.

Sea-3 imports and distributes petroleum products

throughout New England. At all material times, Sea-3 had a

first-priority contractual right, under a so-called Dock

Agreement with Storage Tank, to occupy and use the docking

facilities. In 1983, Sea-3 sought to improve the docking

facilities by making structural changes to Cell Three. Sea-3

contracted with Goudreau to perform the work. Storage Tank

was not a party to that contract.

11. The mooring cells were filled with gravel and capped
with concrete to provide support for the dolphins and
bollards upon which vessels attached their mooring lines.

-16-

On February 5, 1989, Goudreau hired Clausen to work

on Cell Three as a pile driver. Clausen's first day on the

job was February 6, 1989, the day he suffered his injury.

When Clausen arrived at the job site at 7:00 a.m. on the

morning of February 6, 1989, it was snowing. Between one and

two inches of fresh snow had accumulated on the dock. Upon

receiving permission to begin work, Clausen and his

coworkers, Daniel Woundy, William Burroughs, and Kenneth

King, the foreman, proceeded down the walkway-pier towards

Cell Three. Prior to the group's arrival at Cell Three, King

instructed Clausen to go back and retrieve an air compressor

hose that was stored in a guardhouse. Clausen retrieved the

air compressor hose and then headed back down the walkway-

pier toward the ramp that connected the walkway-pier to Cell

Three. Somewhere along the ramp that connected the walkway-

pier to Cell Three, Clausen slipped, fell, and injured his

back.

Immediately after the fall, Clausen experienced

pain that radiated down his back to his ankle. Despite the

pain, Clausen continued to work until his lunch break. After

lunch, Clausen was in too much pain to continue working, and

he decided to go home for the day. Upon arriving at home,

Clausen immediately made an appointment with a chiropractor

for 3:00 p.m. that afternoon.

-17-

For approximately eight weeks following the

accident, Clausen was treated by his chiropractor. A CAT

scan taken two months after the accident revealed a herniated

disk at the L5-S1 level. Consequently, Clausen was referred

to Dr. Gerwin Neumann, a neurosurgeon at the New England

Baptist Hospital. After confirming the diagnosis of a disk

herniation in L5-S1, Dr. Neumann, in May 1989, performed the

first of what would eventually be five operations performed

on various disks in Clausen's back.

At trial, Clausen, the only witness to the

accident, testified that the ramp on which he fell was

constructed of what looked like two-inch thick by ten-inch

wide "staging planks" that were joined together by a couple

of slats. Clausen further testified that the ramp was ten to

twelve feet long and was covered by snow. According to

Clausen, the ramp protruded up over the walkway-pier by ten

to twelve inches so that he had to step up onto the ramp in

order to proceed down to Cell Three. Clausen's testimony

revealed that he initially stepped up onto the ramp with his

left foot. He did not have his hand on the railing because

it did not come up high enough for him to reach it. Clausen

then lifted his right foot off the ground, and, as he was

about to place it on the ramp, his left foot slipped and he

started to fall. Clausen testified that, as he fell, he

twisted to the right and twisted back to the left and grabbed

-18-

onto the railing with his right hand as he was coming down.

Then he hit the ramp. At that point, Clausen was holding

onto the railing and had one hand on the ramp. He then let

himself go and slid down the ramp the rest of the way to Cell

Three. According to Clausen's trial testimony, once he got

to the bottom, he looked back up and saw a sheet of ice about

one-half inch thick covering the ramp from top to bottom.12

Based on Clausen's testimony, the defendants argued

at trial that Clausen had actually slipped on staging planks

that had been placed by Goudreau employees over the existing

ramp that connected the walkway-pier to Cell Three. No

witness testified at trial, however, to having seen staging

planks placed over the ramp. To the contrary, there was

12. Clausen's trial testimony did not comport with his
earlier answers to interrogatories with regard to where he
slipped and fell on the ramp. In response to interrogatories
that inquired about how and where his fall had occurred,
Clausen did not state that he slipped as he stepped onto the
ramp, but rather answered that "[t]he incident occurred at
the junction of the concrete cell and a gangplank connecting
the cell to the pier" and that "[a]s [he] was moving from the
gangplank to the cell, [he] was suddenly caused to slip and
fall."

Clausen's trial testimony was consistent, however, with
previous deposition testimony in which he stated:

So as I stepped up with my left foot and I went to
reach for [the rail], I brought my right foot up
and that's when I slipped and fell. And I twisted
my back and as I came back around, that's when I
grabbed ahold of the railing and I just fell down
on my backside.

-19-

testimony that the ramp was "fixed" between the walkway-pier

and Cell Three and that it did not protrude up over the

walkway-pier, but was "flush" with it so that one had to step

down onto the ramp when walking to Cell Three. There was

further testimony that the ramp had cleats or treads, ten

inches to one foot apart, running crosswise all the way up

the length of the ramp. The ramp itself, according to trial

witnesses, was approximately five feet wide by five feet

long.

Clausen also testified at trial that he still had

back pain that radiated down his left leg. Dr. Neumann

testified that there was a direct causal relationship between

the accident on the ramp and Clausen's herniated disks, which

required five operations to repair. He further testified

that Clausen can lift no more than fifteen to twenty pounds

and is totally disabled from a strenuous job. He noted,

however, that, if Clausen's medical condition were to

stabilize, he could engage in sedentary or clerical activity.

To establish damages at trial, Clausen called

Robert Doucette, an expert economist, to testify about

Clausen's loss of earning capacity. Doucette said he had

examined Clausen's tax returns, copies of union contracts,

medical records, and statistical information pertaining to

work-life expectancy. He testified that he used Clausen's

union contract to calculate Clausen's base wage rate at the

-20-

time of his injury. In reliance on the contract, Doucette

concluded that Clausen was earning a gross hourly wage of

$18.45 when the accident occurred. He then adjusted this

figure upward to $23.85 per hour to account for Clausen's

fringe benefits under the union contract, which included an

annuity fund, a pension fund, and health insurance. From

these preliminary figures, Doucette concluded that it was

reasonable to anticipate that Clausen would have earned

approximately $875,000 in gross wages and $391,000 in

benefits from the time he was injured, at age thirty-four,

through the age of his work-life expectancy.13

Doucette adjusted these gross figures by

subtracting income taxes, adding the average value of

household services at minimum wage, and adding a lump sum to

meet income tax liability on interest earnings. After making

these adjustments, Doucette concluded that the present value

of Clausen's earning capacity on the date of his injury

totaled approximately $1,250,000. He explained that this sum

represents the amount of economic value that Clausen could

have been expected to produce if he had not been injured, and

any pecuniary damages attributable to the injury is measured

13. According to Doucette, work-life expectancy expresses an
average of how long a person may be expected to be in the
labor force earning income. It is a function of a person's
age, sex, level of education, and activity level.

-21-

by the difference between $1,250,000 and what Clausen is

still able to earn in the future.

III.

Storage Tank contends that the district court made

errors both during trial and after trial. Among the former,

Storage Tank alleges mistaken evidentiary rulings and jury

instructions. It argues that the district court erred in (1)

allowing evidence of subsequent remedial measures undertaken

on the ramp where Clausen slipped and fell, (2) denying

Storage Tank's counsel the opportunity to cross-examine

Clausen's economist, Doucette, on the subject of union

benefits that Clausen allegedly received after the accident,

and (3) instructing the jury to assess fault against

Goudreau, a non-party to the trial. In the category of post-

trial error, Storage Tank objects to the district court's (1)

refusal to file its Renewed Motion for Judgment as a Matter

of Law, (2) denial of its Motion for Judgment as a Matter of

Law, and (3) denial of its Motion to Alter or Amend the

Judgment.

We find merit in none of these arguments.

A. Alleged Trial Errors

1. Evidence of Subsequent Remedial Measures

Storage Tank complains of the allowance of evidence

that, in 1992, Storage Tank, at Sea-3's request, replaced a

ramp on which Clausen fell with a set of steps. Prior to

-22-

trial, Storage Tank had filed a motion in limine seeking to

exclude evidence of the changes made to the ramp both on the

issues of negligence and control. Storage Tank argued in its

motion that evidence of subsequent remedial measures is

inadmissible under Fed. R. Evid. 40714 to prove negligent

or culpable conduct. It also contended that, although there

was an unresolved issue in the case about whether Goudreau,

Storage Tank, Sea-3, or some combination of the three

controlled the area where Clausen fell, the evidence of the

ramp's replacement in this case carried no probative weight

with regard to the control issue. The district court denied

Storage Tank's motion in limine, but limited the scope of the

evidence to the issue of who had control over the area where

Clausen's injury occurred. At the end of the trial, the

district court gave the jury a limiting instruction to this

effect.

14. Fed. R. Evid. 407 states:

When, after an event, measures are taken
which, if taken previously, would have made the
event less likely to occur, evidence of the
subsequent measures is not admissible to prove
negligence or culpable conduct in connection with
the event. This rule does not require the

exclusion of evidence of subsequent measures when

offered for another purpose, such as proving

ownership, control, or feasibility of precautionary

measures, if controverted, or impeachment.

(emphasis added).

-23-

On appeal, Storage Tank insists that the district

court should not have allowed Clausen to introduce evidence

of the replacement of the ramp under the control exception to

Fed. R. Evid. 407. It contends that the probative value of

the evidence was "substantially outweighed by the danger of

unfair prejudice, confusion of the issues, or misleading the

jury." Fed. R. Evid. 403.15 Clausen asserts, however,

that we need not reach the merits of Storage Tank's argument

because it did not preserve the issue for appeal by timely

objecting at trial to the admission of the evidence of the

ramp's replacement. We agree.

During the charging conference, the following

exchange occurred:

Mr. Clinton: First of all, your Honor, the
remedial instruction with regard to the issue of
control of the stairs in 1992 was only for the
purpose of control.

The Court: In other words, you admitted it only
for the purpose of control and not for liability?
When it came in, there was no objection. I was

Mr. Clinton: Well, I objected.

15. Fed. R. Evid. 403, in full, states:

Although relevant, evidence may be excluded if
its probative value is substantially outweighed by
the danger of unfair prejudice, confusion of the
issues, or misleading the jury, or by
considerations of undue delay, waste of time, or
needless presentation of cumulative evidence.

-24-

The Court: When? Not when it was offered, not
when it came in. I'll be glad to put in something
like that, but I was sitting here waiting

Mr. Clinton: I filed a motion in limine instead
of repeating. You denied the motion in limine, so
I figured you ruled.

The Court: But when no objection came, I didn't
know at that point whether you had changed your
position or what. . . .

From this colloquy, it appears that Storage Tank felt that

the district court's earlier denial of its motion in limine

had relieved it of any need to object to the admission of the

evidence of the subsequent repair at the time it was offered

at trial.

In United States v. Reed, 977 F.2d 14 (1st Cir.

1992), we said that "[a] motion in limine without subsequent,

contemporaneous objection at trial, . . . is ordinarily

insufficient to preserve an evidentiary ruling for appeal."

Id. at 17 (citing Fed. R. Evid. 103(a)). More recently, we

expanded upon this general proposition by holding:

Where an objection to evidence has been
overruled in limine, it makes sense to require that
the objection be renewed at trial. However
definite the denial of the motion to exclude prior
to trial, it is child's play for the opponent of
the evidence to renew the objection when the
evidence is actually offered; and requiring this
renewal gives the trial judge a chance to
reconsider the ruling with the concrete evidence
presented in the actual context of the trial.

Fusco v. General Motors Corp., 11 F.3d 259, 262 (1st Cir.

1993); see, e.g., United States v. York, 933 F.2d 1343, 1360

(7th Cir.) (holding that "`[a] party whose motion in limine

-25-

has been overruled must object when the error the party

sought to prevent is about to occur at trial'" (quoting

United States v. Roenigk, 810 F.2d 809, 815 (8th Cir.

1987))), cert. denied, 112 S. Ct. 321, 116 L. Ed. 2d 262

(1991); United States v. Khoury, 901 F.2d 948, 966 (11th Cir.

1990) ("A defendant must object at trial to preserve an

objection on appeal; the overruling of a motion in limine

does not suffice."); Wilson v. Waggener, 837 F.2d 220, 222

(5th Cir. 1988) ("A party whose motion in limine is overruled

must renew his objection when the evidence is about to be

introduced at trial."). As the Fifth Circuit explained in

Collins v. Wayne Corp., 621 F.2d 777 (5th Cir. 1980):

Motions in limine are frequently made in the
abstract and in anticipation of some hypothetical
circumstance that may not develop at trial. When a
party files numerous motions in limine, the trial
court may not pay close attention to each one,
believing that many of them are purely
hypothetical. Thus, a party whose motion in limine
has been overruled must object when the error he
sought to prevent with his motion is about to occur
at trial. This will give the trial court an
opportunity to reconsider the grounds of the motion
in light of the actual instead of
hypothetical circumstances at trial.

Id. at 784. This rule "discourage[s] counsel from refraining

from making an objection at trial in order to reserve the

opportunity to assert reversible error on appeal." United

States v. Roenigk, 810 F.2d 809, 815 (8th Cir. 1987).

Because Storage Tank failed timely to object at

trial to the admission of evidence of the subsequent

-26-

alteration to the ramp in 1992, we review the district

court's decision to allow such evidence only for plain error.

Reed, 977 F.2d at 17; see Fed. R. Evid. 103(d). "Plain

error, however, is a rare species in civil litigation . . .

." Gay v. P.K. Lindsay Co., 666 F.2d 710, 712 n.1 (1st Cir.

1981), cert. denied, 456 U.S. 975, 102 S. Ct. 2240, 72 L. Ed.

2d 849 (1982). Even in criminal cases, in the absence of

proper objection we will "`correct only `particularly

egregious errors' . . . that `seriously affect the fairness,

integrity or public reputation of judicial proceedings,''"

United States v. Nason, 9 F.3d 155, 160 (1st Cir. 1993)

(quoting United States v. Young, 470 U.S. 1, 15, 105 S. Ct.

1038, 1046, 84 L. Ed. 2d 1 (1985) (quoting United States v.

Frady, 456 U.S. 152, 163, 102 S. Ct. 1584, 1592, 71 L. Ed. 2d

816 (1982))), cert. denied, S. Ct. , 1994 WL 69882

(1994), and we will reverse only in "`exceptional cases or

under peculiar circumstances to prevent a clear miscarriage

of justice,'" id. at 161 (quoting United States v. Griffin,

818 F.2d 97, 100 (1st Cir.), cert. denied, 484 U.S. 844, 108

S. Ct. 137, 98 L. Ed. 2d 94 (1987)); accord Gay, 666 F.2d at

712 n.1. It is utterly clear that the district court's

decision to permit the evidence of the changes made to the

ramp in 1992, whether right or wrong, was not plain error.

Although Fed. R. Evid. 407 proscribes the admission

of evidence of subsequent remedial measures to "prove

-27-

negligence or culpable conduct," it allows such evidence, as

already noted, "when offered for another purpose, such as

proving . . . control." Fed. R. Evid. 407. The parties

agree that control of the ramp area where Clausen's injury

occurred was a material issue in this case. According to the

appellant, one aspect of the control issue arose because both

Storage Tank and Sea-3 asserted that Goudreau was in control

of the work site and was, therefore, responsible for clearing

and sanding the area where the plaintiff fell. Clausen

points out that a second aspect of the control issue in this

case, not alluded to by Storage Tank, involved whether

Storage Tank, Sea-3, or both jointly, controlled the area

where Clausen fell if Goudreau, at that time, did not control

the ramp.16

To be sure, Storage Tank argues that the evidence

that it made changes to the ramp at the request of Sea-3

subsequent to Clausen's accident was inadmissible under the

16. The trial judge's summary of the control issue sheds
additional light on the parties' arguments:

As I understand it, and as I'm putting it, the
defendants, one, deny that there was an accident,
two, they say if there was an accident, each one
denies that it was responsible and maintains that
any fault was that either of the plaintiff or
Goudreau or both, and to each one there's an issue
as to who was in control of the premises. You're

not in agreement on that, although you both say

that Goudreau was in control of the premises, but

if not, then who was?

(emphasis added).

-28-

control exception to Fed. R. Evid. 407 because the evidence

failed to satisfy the independent requirements of Fed. R.

Evid. 403. Storage Tank maintains that, because the ramp was

replaced in 1992, approximately three years after Clausen's

fall, the evidence is not probative of whether Storage Tank

or Sea-3 controlled the ramp, either separately or jointly,

in 1989, particularly since, according to Storage Tank, the

area had been exclusively occupied by Goudreau when Clausen's

injury occurred. Whatever can be said for such arguments had

Storage Tank preserved its right to argue the merits, they do

not come close to demonstrating that it was plain error for

the district court to believe that the evidence carried at

least some probative weight as to who controlled the ramp in

1989.

Storage Tank also suggests that it was greatly

prejudiced because the jury may have used the evidence of the

ramp's replacement for an improper purpose. The judge,

however, instructed the jury that "[e]vidence of the

subsequent installation of stairs in 1992 is evidence

relevant only on the issue of control. It is not to be

considered evidence of liability or fault." According to the

advisory committee's notes to Fed. R. Evid. 403, "[i]n

reaching a decision whether to exclude on grounds of unfair

prejudice, consideration should be given to the probable

effectiveness or lack of effectiveness of a limiting

-29-

instruction." Although limiting instructions may not always

be effective, see, e.g., United States v. Garcia-Rosa, 876

F.2d 209, 221-22 (1st Cir. 1989), cert. denied, 493 U.S.

1030, 110 S. Ct. 742, 107 L. Ed. 2d 760 (1990), cert. granted

& vacated on other grounds, 498 U.S. 954, 111 S. Ct. 377, 112

L. Ed. 2d 391 (1990), the inadequacy of the one in this

situation is scarcely so patent as to support a finding of

plain error. We do not readily assume that a jury disregards

clear directions. See Gutierrez-Rodriguez v. Cartagena, 882

F.2d 553, 574 (1st Cir. 1989).

We are satisfied that admission of the evidence was

not plain error.

2. Cross-Examination of Clausen's Expert, Doucette

At trial, Clausen testified that, as a union

member, he had enjoyed certain union employee fringe

benefits, including a pension plan, an annuity fund, and a

"health and welfare dental plan." Clausen did not mention,

in this regard, workers' compensation payments, union

disability benefits, or social security disability benefits.

Later in the trial, Clausen's expert, Doucette, estimated

Clausen's pecuniary damages (i.e., lost future earnings),

including wages and fringe benefits lost because of his

inability to perform his former job due to the injury. In

determining this figure, Doucette testified that Clausen, at

the time of his injury, had earned "a gross hourly wage of

-30-

$18.45 per hour." He also testified that Clausen had then

enjoyed fringe benefits consisting of "an annuity fund, a

pension fund, and health and welfare, which is health

insurance" the gross future value of which, calculated

from the time of Clausen's injury through his age of work-

life expectancy, totaled $391,000. Doucette did not mention

workers' compensation payments, union disability benefits, or

social security disability benefits.

Prior to cross-examining Doucette, counsel for

Storage Tank requested

a ruling that [he] be allowed on cross-examination
to go into the union benefits, such as [Clausen's]

disability benefits that he's currently receiving

and any Social Security benefits, since they have

opened it up by bringing it in as being factors.

(emphasis added). Counsel for Clausen strenuously objected,

saying the mentioned evidence had gone "only as to

[Clausen's] earnings," there being "nothing said with respect

to [Clausen] being economically deprived now because of no

money or anything like that." After hearing from both

parties, the court denied Storage Tank's request. In

response, Storage Tank's counsel made an offer of proof:

Note my exception, your Honor, but on the basis
this is the collateral [source rule]. He's raised
the issue. This is an offer. He's raised the
[issue] of fringe benefits under unions and he's
currently receiving disability benefits.

The district court denied Storage Tank's request

undoubtedly because of New Hampshire's collateral source

-31-

rule,17 which provides that "a plaintiff [who] is

compensated in whole or in part for his damages by some

source independent of the tort-feasor . . . is still

permitted to make full recovery against him." Moulton v.

Groveton Papers Co., 114 N.H. 505, 509, 323 A.2d 906, 909

(1974). According to the Supreme Court of New Hampshire,

"[t]he rule that collateral benefits are not subtracted from

the plaintiff's recovery has been applied to benefits paid

under an insurance policy or by a relief association;

employment benefits; gratuitous payments; social legislation

benefits such as social security, welfare, pensions; and

benefits received under certain retirement acts." Id. One

commentator has observed that "[t]he most obvious effect of

the collateral source rule is that it `enables a plaintiff to

reap a double recovery in certain circumstances.' In other

words, `[t]he collateral source rule is an exception to the

general rule that damages in tort should be compensatory

only.'" Joel K. Jacobsen, The Collateral Source Rule and the

17. "Properly analyzed, the collateral source rule is a
substantive rule of damages and not a rule of evidence."
Joel K. Jacobsen, The Collateral Source Rule and the Role of

the Jury, 70 Or. L. Rev. 523, 526 (1991); see, e.g., McInnis

v. A.M.F., Inc., 765 F.2d 240, 245 (1st Cir. 1985) ("[I]t is

well recognized that Congress did not intend the [Federal
Rules of Evidence] to preempt . . . `substantive' state rules
. . . such as the . . . collateral source rule . . . ."). In
their Joint Pretrial Memorandum, the parties agreed that "New
Hampshire tort law and contract law govern the legal rights
and duties of all parties at issue herein." Accordingly, we
will abide by New Hampshire's collateral source rule.

-32-

Role of the Jury, 70 Or. L. Rev. 523, 524 (1991) (quoting

Chenoweth v. Schaaf, 576 F. Supp. 1556, 1558 (W.D. Pa. 1984)

and Overton v. United States, 619 F.2d 1299, 1306 (8th Cir.

1980) in that order).18

Although New Hampshire's collateral source rule

serves substantive state policies, its application also

affects the admissibility of certain evidence. Courts have

held, for instance, that, under the Federal Rules of

Evidence, "evidence of collateral benefits [ordinarily] has

18. Courts have expressed various policy rationales for the
collateral source rule. "Most fall into two broad
categories. The rule is intended either (1) to punish the
tortfeasor, or (2) to ensure that the injured party receives
benefits for which he or she has contracted." Jacobsen, The

Collateral Source Rule and the Role of the Jury, supra note

17, at 528. The Supreme Court of New Hampshire has
summarized these rationales as follows:

The basic argument advanced for [the rule's]
application is that a tort-feasor should not be
allowed to escape the consequences of his wrongful
act merely because his victim has received a
benefit from a collateral source which would
constitute a windfall to the defendant wrongdoer.
It is also pointed out that in many instances the
plaintiff has paid for these benefits in the form
of insurance premiums or concessions in the wages
he received because of such fringe benefits. If
such considerations are not present and the
payments are gratuitous, it is maintained that the
maker of these payments did not intend to relieve
the tort-feasor of any liability, but rather to aid
the plaintiff by doing him a favor. . . . It is
also argued that the collateral source rule is
designed to offset the inability of ordinary
damages to adequately compensate an injured
accident victim.

Moulton v. Groveton Papers Co., 114 N.H. 505, 509-10, 323

A.2d 906, 909 (1974).

-33-

no relevance in the lawsuit," Phillips v. Western Co. of N.

Am., 953 F.2d 923, 930 (5th Cir. 1992), because the existence

of such benefits is of no consequence to the trier of fact's

determination of damages. See Fed. R. Evid. 401. "Evidence

that is not relevant, of course, is not admissible. Fed. R.

Evid. 402." Phillips, 953 F.2d at 930.

In some cases, however, federal courts, although

subject to a state's collateral source rule, have allowed

evidence of collateral payments when relevant to some other

issue. Courts have allowed defendants to introduce evidence

of collateral payments to show malingering or to rebut

misleading testimony given on direct examination. See, e.g.,

DeMedeiros v. Koehring Co., 709 F.2d 734 (1st Cir. 1983)

(affirming the district court's decision to allow the

defendants to introduce evidence that the plaintiff was

receiving $185 per week in workers' compensation disability

benefits for the limited purpose of proving the plaintiff's

motivation in declining an employment opportunity); Lange v.

Missouri Pac. R.R. Co., 703 F.2d 322, 324 (8th Cir. 1983)

(finding that "evidence concerning [the plaintiff's] receipt

of workers' compensation benefits was relevant to test the

credibility of plaintiff's assertion that he had to return to

work immediately after the surgery because he had no

disability income"). Evidence of collateral payments has

also been allowed on cross-examination after the plaintiff

-34-

has specifically referred to such payments on direct

examination. Hannah v. Haskins, 612 F.2d 373, 375 (8th Cir.

1980) (affirming the district court's decision to allow the

defendant on cross-examination to elicit information about

collateral source payments referred to by the plaintiff on

direct examination).

Here, Storage Tank argues, citing Haskins, that the

district court erred in denying its request to cross-examine

Doucette on the issue of disability benefits that Clausen

received after the accident because Doucette had raised the

issue of employee benefits on direct examination. We do not

agree. Storage Tank's counsel sought permission to cross-

examine Doucette as to "disability benefits that [Clausen] is

currently receiving and any Social Security benefits." These

were not the benefits Clausen and Doucette had testified were

lost by reason of Clausen's injury Doucette mentioned

Clausen's loss of "an annuity fund, a pension fund, and

health and welfare, which is health insurance." The district

court had good reason to think that Storage Tank was

proposing to delve into different contemporary benefits in

order to persuade the jury to reduce its damages award by the

amount of collateral payments that were currently being

received from other sources by the disabled plaintiff.

Preventing such inquiry was consistent with New Hampshire's

collateral source rule. If Storage Tank had wished to

-35-

examine Doucette on the accuracy of his projections of

Clausen's economic loss relative to the annuity fund, pension

fund, and health insurance, it needed to say so, see infra,

rather than merely saying it wanted to cross-examine about

disability and social security benefits now being paid to

Clausen.

Storage Tank's reliance on Haskins is misplaced.

In Haskins, the plaintiff, on direct examination, had

testified that certain medical bills had been paid from

collateral sources, namely, Blue Cross, Blue Shield, and

Medicaid. The district court allowed the defendant's

attorney to "elicit[] further information concerning the type

and scope of the collateral source payments." Haskins, 612

F.2d at 375. Here, by contrast, Clausen and Doucette never

testified that Clausen was receiving collateral source

payments (e.g., workers' compensation, union disability

benefits, or social security disability benefits). Rather,

they testified that Clausen had permanently lost certain

employee benefits by reason of his accident (i.e., "an

annuity fund, a pension fund, and health and welfare"). The

district court could reasonably believe that Doucette's

testimony concerning the purported value of particular

benefits that Clausen had allegedly lost because of his

injury did not "open the door" to cross-examination

-36-

concerning the receipt by Clausen of what appeared to be

different benefits.19

We recognize that there is some force to Storage

Tank's argument, relying on Lange, that, notwithstanding the

collateral source rule, it was entitled to cross-examine

Doucette regarding Clausen's receipt of disability benefits

to show that Clausen had not actually lost employee benefits

as indicated by Doucette on direct examination. In this same

vein, Storage Tank asserts that, had the district court

permitted it to demonstrate on cross-examination that Clausen

had not lost his employee benefits, it would have thereby

impeached Doucette's credibility. We need not reach the

merits of these arguments, however, because Storage Tank

raises them for the first time on appeal.

We have held that "[a] party may not claim error on

appeal in the exclusion of evidence unless the district court

was told not only what the party intended to prove but also

for what purpose." Tate v. Robbins & Myers, Inc., 790 F.2d

10, 12 (1st Cir. 1986) (citing 1 Jack B. Weinstein & Margaret

19. We note that "[t]rial judges retain broad discretion to
impose reasonable limitations on the scope of cross-
examination," United States v. Alvarez, 987 F.2d 77, 82 (1st

Cir.) (citing Delaware v. Van Arsdall, 475 U.S. 673, 679, 106

S. Ct. 1431, 1435, 89 L. Ed. 2d 674 (1986)), cert. denied,

114 S. Ct. 147 (1993), and "[w]e review district court
limitations on cross-examination for `abuse of discretion,'"
United States v. Carty, 993 F.2d 1005, 1010 (1st Cir. 1993)

(quoting United States v. Boylan, 898 F.2d 230, 254 (1st

Cir.), cert. denied, 498 U.S. 849, 111 S. Ct. 139, 112 L. Ed.

2d 106 (1990)).

-37-

A. Berger, Weinstein's Evidence 103[03], at 103-33 (1985

ed.) ("In making an offer of proof counsel must be careful to

articulate every purpose for which the evidence is

admissible; a purpose not identified at the trial level will

not provide a basis for reversal on appeal.")). Accordingly,

"if evidence is excluded because it is inadmissible for its

only articulated purpose, the proponent of the evidence

cannot challenge the ruling on appeal on the ground that the

evidence `could have been rightly admitted for another

purpose.'" Id. (quoting 1 Kenneth S. Broun et al., McCormick

on Evidence 51, at [199 (1992)]).

At trial, Storage Tank argued that it should be

allowed to cross-examine Doucette about certain collateral

source payments received by Clausen because he (Doucette) had

referred during direct examination to other employee fringe

benefits lost by Clausen after his injury. The district

court rejected this argument. See discussion, supra.

Counsel for Storage Tank at no time stated that the proffered

evidence (i.e., that Clausen was receiving disability and

social security benefits) should be admitted either to show

that Clausen had not, in fact, suffered damages through the

loss of his annuity fund, pension plan, or health insurance,

or to impeach Doucette's credibility. These arguments

cannot, therefore, be entertained.

-38-

3. Including Goudreau in the Proration of Fault

Instruction to the Jury

The parties filed with the district court a Joint

Request for Special Jury Questions, which was signed by

counsel for Clausen, Storage Tank, and Sea-3, and which

formed the basis of the special verdict questions submitted

to the jury. This document contained, among others, the

following questions:

3.(a) Was Goudreau Corp. negligent?

***

(b) If so, was the negligence of Goudreau
Corp. a proximate cause of plaintiff's
injury?

***

5. State in what percentage the plaintiff's
negligence and defendants' negligence
caused or contributed to the injuries
alleged.

Eric Clausen's negligence: %

Storage Tank Development Corp.'s
negligence:
%

Sea-3, Inc.'s negligence: %

Goudreau Corp.'s negligence: %

100 %

Although counsel for Storage Tank and Sea-3 had signed-off on

these questions, during a charging conference held on the

afternoon of the third day of trial, counsel for Sea-3

objected to the inclusion of Goudreau on the special verdict

-39-

form. Specifically, counsel for Sea-3 argued to the district

court that "we should not have Goudreau Corporation, because

they're not a party to this case, and . . . to include them

would confuse the jury with respect to finding liability

against a party that's not here." Counsel for Sea-3 further

asserted that "[m]y concern is that we have an [indemnity]

action against Goudreau . . . [a]nd I don't want this jury's

finding to be on that process [sic], and, hence, I object to

its presence here." Counsel for Storage Tank neither joined

in Sea-3's objection nor expressed any dissatisfaction

whatsoever with the inclusion of Goudreau in the special

verdict questions.

Counsel for Sea-3 again raised his objection to

Goudreau's inclusion in the special verdict questions just

prior to the district court's charge to the jury. He

maintained that his only problem with the special verdict

questions was "the inclusion of Goudreau." Counsel for

Storage Tank, on the other hand, stated that he had "no

problem" with the special verdict questions and that he had

"no objection" to the instructions. Notwithstanding Sea-3's

objection, the district court did not exclude Goudreau from

the special verdict questions, which were given to the jury

in nearly identical form to the Joint Request for Special

Jury Questions submitted previously by the parties.

-40-

On appeal, Storage Tank argues that the district

court committed reversible error by allowing the jury to

assign liability to Goudreau because Goudreau was not a party

defendant at trial. It contends that the district court, by

allowing the jury to apportion fault against Goudreau,

violated N.H. Rev. Stat. Ann. 507:7-e, I(a) (1986), which

orders the trial court to "[i]nstruct the jury to determine

. . . the amount of damages to be awarded to each claimant

and against each defendant in accordance with the

proportionate fault of each of the parties." Storage Tank

interprets this statute to mean that it is impermissible for

a trial court to instruct a jury to find the proportionate

fault of a non-party. In this context, Storage Tank argues

that Goudreau was not a party in its trial with Clausen, and,

therefore, the district court, by virtue of 507:7-e, I(a),

erred by instructing the jury to apportion fault against

Goudreau.

Clausen counters Storage Tank's argument by

asserting that Storage Tank failed to preserve for appeal the

issue that the district court did not comply with N.H. Rev.

Stat. Ann. 507:7-e, I(a). He points out that Storage Tank

not only asked that Goudreau be included in special verdict

questions in the parties' Joint Request for Special Jury

Questions, but also failed to object to the special verdict

questions at any time during trial. We agree with Clausen.

-41-

Fed. R. Civ. P. 51 states, inter alia, that "[n]o

party may assign as error the giving or the failure to give

an instruction unless that party objects thereto before the

jury retires to consider its verdict, stating distinctly the

matter objected to and the grounds of the objection."

(emphasis added). "This rule applies to special

interrogatories as well as verbal instructions." Phav v.

Trueblood, Inc., 915 F.2d 764, 769 (1st Cir. 1990). We have

held that

a litigant who accedes to the form of a special
interrogatory will not be heard to complain after
the fact. . . . If a slip has been made, the
parties detrimentally affected must act
expeditiously to cure it, not lie in wait and ask
for another trial when matters turn out not to
their liking.

Anderson v. Cryovac, Inc., 862 F.2d 910, 918 (1st Cir. 1988).

Here, Storage Tank acceded to the form of the special verdict

questions; it participated in the parties' Joint Request for

Special Jury Questions, and then informed the trial judge,

just before he instructed the jury, that it had "no problem"

with the special verdict questions. "It follows inexorably

that [Storage Tank has] waived the right to press an

objection on appeal." La Amiga del Pueblo, Inc. v. Robles,

937 F.2d 689, 692 (1st Cir. 1991); see Toscano v. Chandris,

S.A., 934 F.2d 383, 384-85 (1st Cir. 1991) ("[W]hen the

appellants sat idly by and allowed the court's instructions

-42-

to the jury to stand unchallenged, they waived the right to

press the objections which they now attempt to advance.").

Nor can we say that it was plain error for the

district court to ask the jury in special verdict questions

to assign fault to Goudreau. As we have noted, "[t]he plain

error standard, high in any event, . . . is near its zenith

in the Rule 51 milieu." Toscano, 934 F.2d at 385. "[I]t

applies only where the error results in a `clear miscarriage

of justice' or seriously affects `the fairness, integrity or

public reputation of judicial proceedings.'" Phav, 915 F.2d

at 769 (quoting Smith v. Massachusetts Inst. of Technology,

877 F.2d 1106, 1110 (1st Cir.), cert. denied, 493 U.S. 965,

110 S. Ct. 406, 107 L. Ed. 2d 372 (1989)). In this instance,

the district court's special verdict questions, if erroneous

at all, did not reach the pinnacle of fault envisioned by the

plain error standard.20

B. Alleged Post-Trial Errors

1. Refusal to File Storage Tank's Renewed Motion for

Judgment as a Matter of Law and Denial of Storage

Tank's Motion for Judgment as a Matter of Law

At the end of evidence, Storage Tank filed a Motion

for Judgment as a Matter of Law, which the district court

20. The Supreme Court of New Hampshire has not addressed the
issue and it is unclear, insofar as we are aware, whether
third-party defendants, who are not involved in the immediate
trial involving the plaintiff and the defendant(s), are or
are not "parties" as that term appears in N.H. Rev. Stat.
Ann. 507:7-e.

-43-

denied. Within ten days after the entry of judgment, Storage

Tank filed, pursuant to Fed. R. Civ. P. 50(b), a Renewed

Motion for Judgment as a Matter of Law. The district court

refused to file the later motion because it failed to include

a certificate of compliance with U.S. Dist. Ct. R., D.N.H.

11(b).21 On appeal, Storage Tank assigns error to both of

these decisions.

a. Refusal to File Storage Tank's Renewed Motion

for Judgment as a Matter of Law

Storage Tank initially contends that the district

court erred in refusing to file its Renewed Motion for

Judgment as a Matter of Law for failure to comply with U.S.

Dist. Ct. R., D.N.H 11(b). According to Storage Tank, Local

Rule 11 does not apply to a Renewed Motion for Judgment as a

Matter of Law. We disagree.

U.S. Dist. Ct. R., D.N.H. 11(a)(1) states that

"[m]otions other than during trial will be considered only if

submitted separately from other pleadings on a document using

the word `Motion' in the title. The Clerk shall not accept

21. District of New Hampshire Local Rule 11(b) states:

(b) SEEKING CONCURRENCE IN MOTIONS

The moving party shall certify to the court
that he has made a good faith attempt to obtain
concurrence in the relief sought. If the moving
party has obtained concurrence, he shall so state
in the body of the motion so the court may consider
it without delay.

-44-

any motions not in compliance with procedures outlined in

these Rules." (emphasis added). Assuming, arguendo, that

the phrase "any motions" in the second sentence of Local Rule

11(a)(1) means "any motions other than during trial," the

issue becomes whether a Renewed Motion for Judgment as a

Matter of Law is a trial motion, which is not subject to

Local Rule 11, or a "motion other than during trial," which

is subject to Local Rule 11. Like the district court, we

conclude that a Renewed Motion for Judgment as a Matter of

Law, which may be filed as many as ten days after the entry

of judgment, is a "motion other than during trial" that must

comply with the strictures of Local Rule 11(b). Accordingly,

the district court was entitled to enforce its local rule by

refusing to file Storage Tank's Renewed Motion for Judgment

as a Matter of Law, and we cannot say that, by doing so, it

engaged in a clear injustice. See Atlas Truck Leasing, Inc.

v. First NH Banks, Inc., 808 F.2d 902, 903 (1st Cir. 1987)

("We will reverse [the district court's] determination only

if the ruling results in clear injustice."). We note, in

this regard, that Storage Tank's proffered Renewed Motion for

Judgment as a Matter of Law was virtually identical to its

earlier Motion for Judgment as a Matter of Law, denial of

which is reviewable on appeal.

b. Denial of Storage Tank's Motion for Judgment

as a Matter of Law

-45-

Appellate review of the denial of a Motion for

Judgment as a Matter of Law is limited. As has often been

said, "we must examine the evidence in the light most

favorable to the plaintiff and determine whether there are

facts and inferences reasonably drawn from those facts which

lead to but one conclusion that there is a total failure of

evidence to prove the plaintiff's case." Fact Concerts, Inc.

v. City of Newport, 626 F.2d 1060, 1064 (1st Cir. 1980),

vacated on other grounds, 453 U.S. 247, 101 S. Ct. 2748, 69

L. Ed. 2d 616 (1981), quoted in Gonzalez-Marin v. Equitable

Life Assurance Soc'y of the United States, 845 F.2d 1140,

1144 (1st Cir. 1988); Mayo v. Schooner Capital Corp., 825

F.2d 566, 568 (1st Cir. 1987). Moreover, "`we may not

consider the credibility of witnesses, resolve conflicts in

testimony, or evaluate the weight of the evidence.'" Putnam

Resources v. Pateman, 958 F.2d 448, 459 (1st Cir. 1992)

(quoting Wagenmann v. Adams, 829 F.2d 196, 200 (1st Cir.

1987)).

In its Motion for Judgment as a Matter of Law,

Storage Tank argued that it could not be found liable because

(1) the danger to Clausen was obvious and he failed to ensure

his own safety, and (2) Storage Tank had no notice of the

dangerous condition. On appeal, Storage Tank raises two

additional arguments not made in its Motion for Judgment as a

Matter of Law. First, it contends that Clausen's trial

-46-

testimony unequivocally established that he fell on staging

planks that had been placed over the existing ramp.

Consequently, Storage Tank maintains that, because it did not

either own or control staging planks or receive notice

that staging planks had been placed over the existing ramp

there was insufficient evidence upon which a reasonable jury

could have found Storage Tank negligent. Second, Storage

Tank asserts that "Goudreau . . . assumed responsibility for

the safety of the work area pursuant to the written

contract." We decline to reach the merits of these freshly

raised arguments, however, because "[a]ppellate review may be

obtained only on the specific ground stated in the motion for

directed verdict." Wells Real Estate, Inc. v. Greater Lowell

Bd. of Realtors, 850 F.2d 803, 810 (1st Cir.) (citing

Pstragowski v. Metropolitan Life Ins. Co., 553 F.2d 1, 3 (1st

Cir. 1977)), cert. denied, 488 U.S. 955, 109 S. Ct. 392, 102

L. Ed. 2d 381 (1988).

With regard to whether Clausen was contributorily

negligent for failing to observe an obvious danger, we find

sufficient evidence upon which a reasonable jury could find

that he was not. Clausen was injured on his first day on the

job and on his first trip down the ramp. He, therefore, had

no prior personal experience with the slippery condition of

the ramp. Moreover, Clausen testified that the one-half-inch

sheet of ice that caked the ramp was concealed by snow and

-47-

that nobody had told him prior to the accident about the

presence of ice on the ramp. Similarly unavailing is Storage

Tank's contention that it is entitled to judgment as a matter

of law because it did not receive notice of the ramp's

dangerous condition or an opportunity to take remedial

action. Because there was evidence at trial from which the

jury could reasonably find that Storage Tank knew or should

have known that ice and snow would accumulate on the ramp and

that Storage Tank was responsible for taking action to clear

the ramp, the jury "could likewise find that reasonable care

required that [Storage Tank] should have taken such action."

Tremblay v. Donnelly, 103 N.H. 498, 500, 175 A.2d 391, 393

(1961). We decline to disturb the district court's

conclusion that Clausen presented evidence sufficient for a

reasonable jury to find Storage Tank negligent.

2. Denial of Storage Tank's Motion to Alter or Amend

Judgment

Storage Tank maintains that the district court

erred in denying its Motion to Alter or Amend the Judgment,

which asserted that the jury's verdict was grossly excessive,

not supported by the facts, and subject to remittitur.

Having considered Storage Tank's argument and the record

before us, we cannot say that the jury's verdict of

$1,426,000 was so exorbitant that the district court abused

its discretion by denying Storage Tank's request for

remittitur. See, e.g., American Business Interiors, Inc. v.

-48-

Haworth, Inc., 798 F.2d 1135, 1146 (8th Cir. 1986) (holding

that, because "the trial court has heard the evidence and

knows the community's standards, [a court of appeals] will

reverse a denial of remittitur only when in rare

circumstances [it is] pressed to conclude that the verdict

represents a monstrous or shocking injustice").

The judgment of the district court is affirmed.

Costs to appellee.

-49-